STATE of Tennessee, Appellee,

v.

Jeffrey Stuart DICKS, Appellant.

Supreme Court of Tennessee.

Feb. 2, 1981.

Rehearing Denied May 4, 1981.

James H. Beeler, Kingsport, Larry S. Weddington, Bristol, Richard Maxwell, Bart Durham, Nashville, J. Lawrence Smith, Asheville, N.C., for appellant.

William M. Leech, Jr., Atty. Gen. and Reporter, Robert L. Jolley, Jr., Asst. Atty. Gen., Nashville, for appellee.

## OPINION

COOPER, Justice.

This case is before us pursuant to T.C.A. § 39–2406, which provides for review by this court of every case in which a death penalty is imposed.

Appellant, Jeffrey Stuart Dicks, was found guilty of murder in the first degree for the killing of James Keegan in the course of the robbery of the Budget Shop in Kingsport, Tennessee. The Budget Shop is a second-hand clothing store. Mr. Keegan, the owner, was known to carry a substantial sum of money on his person to be used in the business. On February 16, 1978, Mr. Keegan's body was found on the floor of his place of business. His throat had been cut and there was evidence of a severe blow to his head. Death was due to the throat wound which, according to medical testimony, was inflicted while Mr. Keegan was unconscious from the head injury. A search of Mr. Keegan's person and his business establishment revealed that Mr. Keegan's money had been taken. Appellant and Donald Wayne "Chief" Strouth subsequently were arrested and indicted on a charge of murder in the first degree (murder in the perpetration of a robbery.) The defendants were tried separately, to avoid

the possibility of a *Bruton*[1] violation inherent in the fact that each of the defendants had given investigating officers a statement implicating the other. Appellant also was granted a change of venue from Sullivan County, where the crime was committed, to Greene County. On trial, appellant was found guilty of murder in the first degree. In a subsequent hearing to determine the sentence to be imposed on the defendant, the jury found the following statutory aggravating circumstances:

The murder was especially heinous, atrocious or cruel in that it involved torture and depravity of mind; and

The murder was committed while the defendant was engaged in committing or was an accomplice in the commission of, or was attempting to commit any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing or placing of a destructive device or bomb."

The jury also found that "there [were] no mitigating circumstances sufficiently substantial to outweigh the statutory aggravating circumstance or circumstances," and sentenced appellant to death.

Appellant does not specifically question the sufficiency of the convicting evidence. He does question rulings by the trial judge on the admissibility of evidence in the guilt-determination phase of the trial, evidently on the bases that photographic evidence admitted tended to inflame the jury, and that statements by Donald Strouth and testimony of a psychologist, which were excluded, tended to show that appellant did no more than accompany the killer of James Keegan. Appellant also insists (1) that the sentencing to death of a defendant who did no more than "accompany the killer on the underlying felony" is grossly disproportionate to the defendant's moral guilt and is cruel and inhuman punishment, and (2) that sections of T.C.A. § 39–2404, dealing with punishment for first degree murder, are unconstitutional.

■ The photographic evidence admitted over the objection of the appellant con-sisted of "before and after" photographs of Mr. Keegan, and a photograph of the defendant. Appellant insists the photographs of Mr. Keegan created a vivid picture of life and death for the jury, were without evidentiary value, and were clearly prejudicial. We find no prejudicial error in the admission of the photographs, though it would have been better had the "before" picture of Mr. Keegan been excluded since it added little or nothing to the sum total of knowledge of the jury. The other two pictures, however, were relevant to material issues in the trial and were not inflammatory. The picture of Mr. Keegan taken at the scene of the homicide, and which does not show the neck wound, was a necessary predicate to proof that Mr. Keegan was unconscious at the time his throat was cut. The physician, who so testified, did so partly on the photographic evidence showing the position of Mr. Keegan's body and the absence of blood on Mr. Keegan's hand as shown in the photograph, and partly on the description of the wound.

■ The photograph of the defendant was relevant to the issue of identification. Barry Willis identified the coat shown in the photograph as the one appellant was wearing when he was seen by Willis on February 14, 1978, in the vicinity of the Budget Shop. Further, there was evidence that relatives of appellant had burned a long, green coat in the "dead of night," after police officers had come to their home seeking information concerning the appellant. It was the coat shown in the picture and the coat appellant admittedly was wearing at the time of the homicide.

■ Appellant sought to call Donald Strouth as a witness in his behalf. When the trial judge excused Strouth from testifying, appellant sought to have admitted into evidence, through Barbara Davis, statements by Strouth which appellant contends were against penal interest. These statements were excluded by a ruling of the trial judge in a jury-out hearing. These rulings by the trial judge are assigned as error.

---

1. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

Appellant insists the trial judge erred in not forcing Strouth to testify or, at least, forcing him to claim his Fifth Amendment privilege in the presence of the jury. At the time of appellant's trial, Strouth stood convicted of the robbery and murder of James Keegan and was under a sentence of death. His case was on appeal to this court. In a jury-out hearing, the trial judge determined that Strouth had not testified in his own trial, and was going to exercise his Fifth Amendment privilege not to testify in appellant's trial. As a consequence, the trial judge excused Strouth from taking the stand. We see no basic error in the trial judge's action.

■ The calling of a witness who will refuse to testify does not fill the purpose of compulsory process, which is to produce testimony for the defendant. *United States v. Roberts*, 503 F.2d 598, 600 (9th Cir. 1974). But if it did, where there is a conflict between the basic right of a defendant to compulsory process and the witness's right against self-incrimination, as in this case, the right against self-incrimination is the stronger and paramount right. *Frazier v. State*, 566 S.W.2d 545, 551 (Tenn.Crim.App. 1978). *See United States v. Johnson*, 488 F.2d 1206 (1st Cir. 1973); *United States v. Wyler*, 487 F.2d 170 (2nd Cir. 1973); *United States v. Beye*, 445 F.2d 1037 (9th Cir. 1971). Further, a jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege against self-incrimination, whether those inferences be favorable to the prosecution or the defense. *Bowles v. United States*, 439 F.2d 536, 541 (D.C.Cir.1970). *See also United States v. Johnson*, 488 F.2d 1206, 1211 (1st Cir. 1973), wherein the court points out that:

> If it appears that a witness intends to claim the privilege as to essentially all questions, the court may, in its discretion, refuse to allow him to take the stand. Neither side has a right to benefit from any inferences the jury may draw simply from the witness' assertion of the privilege either alone or in conjunction with questions that have been put to him.

The court also noted in *Johnson* that the cases saying it was not always reversible error to call such a witness to the stand fall short of establishing that the practice is either desirable or mandatory. 488 F.2d at 1211 n. 5. *See generally*, Annot., 86 A.L. R.2d 1443 (1962).

■ Appellant also insists that the trial judge, having excused Strouth from testifying, erred in excluding testimony of Miss Davis relative to her conversations with Strouth. This court has recognized in principle that declarations against penal interest, made by an unavailable declarant, are admissible in criminal cases where the declarations are proven trustworthy by independent corroborative evidence that bespeaks reliability. *Smith v. State*, 587 S.W.2d 659, 661 (1979). But, appellant did not seek to have Miss Davis testify as to statements made by Strouth, but sought to have her testify as to impressions she formed from conversations she had had with Strouth. These impressions do not come within the exception carved out of the hearsay exclusion rule to permit the introduction of declarations against penal interest, and the trial judge properly excluded such testimony.

■ Appellant also insists the trial judge erred in refusing to allow Dr. David McMillan, a clinical psychologist, to testify in the first phase, the guilt and innocence phase, of the trial. Dr. McMillan had administered a battery of tests including the Wexler Adult Intelligence Scale, Gender Gestalt Test, Rorschak Ink Blot Test, Thematic A Perception Test, Incomplete Sentence Blank and the Minnesota Multiphasic Personality Inventory. From these tests, Dr. McMillan proposed to testify that appellant "is a weak, moody, fearful person, and is a follower instead of a leader." No contention was made in behalf of appellant, nor could Dr. McMillan testify, that appellant was insane or incompetent under the test set forth in *Graham v. State*, 547 S.W.2d 531 (Tenn.1977). The trial judge concluded this evidence would be admissible in the punishment phase of the trial, being relevant to mitigating circumstances, but that it was

not related to any issue in the guilt-determination phase of the trial. We see no error in these rulings.

■■■■ Appellant insists that the sentencing to death of a defendant who did no more than "accompany the killer on the underlying felony" is grossly disproportionate to the defendants moral guilt and is cruel and inhuman punishment. "Felony murder" can be the aggravating circumstance which justifies the imposition of the death penalty. See Presnell v. Georgia, 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978); Jurek v. Texas, 428 U.S. 262, 268, 96 S.Ct. 2950, 2955, 49 L.Ed.2d 929 (1976); Cozzolino v. State, 584 S.W.2d 765 (Tenn.1979). However, if the evidence in this case showed that appellant merely accompanied Strouth to the Budget Shop and waited outside in the get-away automobile as insisted by appellant, we would give serious consideration to holding, as did Justice White in Lockett v. Ohio, 438 U.S. 621, 98 S.Ct. 2981, 57 L.Ed.2d 1000 (1978), "that death may not be inflicted for killings consistent with the Eighth Amendment without a finding that the defendant engaged in conduct with the conscious purpose of producing death...." 98 S.Ct. at 2985. But the evidence indicates that appellant's activities exceeded the mere accompanying of Strouth and driving of the get-away automobile. After the robbery and murder, two sets of footprints were found outside the rear entrance of the Budget Shop. Both sets of footprints were spaced so that they clearly indicated the persons making the prints "were running" as they left the shop. At the approximate time of the robbery and homicide, appellant and Strouth were observed on the roadway near the mouth of the alley leading from the Budget Shop running toward the home of appellant. Immediately on reaching his home, appellant collected his girlfriend and left Kingsport, taking no possessions with him. Further, appellant admits taking a "few" dollars from the robbery proceeds and used them in getting away from Kingsport. We think a jury reasonably could find from this evidence that appellant was an active participant in the robbery and murder of Mr. Keegan and was not, as appellant claimed, waiting for Strouth in an automobile.

In the remaining assignment of error, appellant insists that T.C.A. § 39–2404(g) [2] is unconstitutional in that it "creates the presumption of death if one or more aggravating circumstances are proved, creating an unlawful shift in the burden of proof to the defendant." T.C.A. § 39–3404(g) is also attacked on the ground it makes death mandatory under certain conditions and does not allow the jury the opportunity to show mercy. Appellant also insists that T.C.A. § 39–2404(i)(5)—one of the aggravating circumstances found by the jury—is unconstitutionally vague and overbroad. We see no merit in either instance.

■■■ In this state, a trial on a charge of first degree murder is a bifurcated proceeding, with the jury first determining the defendant's guilt or innocence of the charge. Where it is found that the defendant is guilty of first degree murder, a second proceeding is held before the same jury to determine the sentence—either life imprisonment, or death—to be imposed. T.C.A. § 39–2404(a). The jury may impose the death penalty only upon finding that one or more aggravating circumstances listed in the statute are present, and further that such circumstance or circumstances are not outweighed by any mitigating circumstance. T.C.A. § 39–2404(g). The burden of proof rests upon the state to establish the aggravating circumstances beyond a

2. If the jury unanimously determines that at least one statutory aggravating circumstance or several statutory aggravating circumstances have been proved by the state beyond a reasonable doubt, and said circumstance or circumstances are not outweighed by any mitigating circumstances, the sentence shall be death. If the death penalty is the sentence of the jury, the jury shall (1) reduce to writing the statutory aggravating circumstance or statutory aggravating circumstances so found and (2) signify that there were no mitigating circumstances sufficiently substantial to outweigh the statutory aggravating circumstance or circumstances so found. These findings and verdict shall be returned to the judge upon a form provided by the court ....

reasonable doubt and the jury must specifically find that these outweigh any mitigating circumstances before they are justified in imposing the death penalty. T.C.A. § 39–2404(f). These separate determinations must be put in writing and given to the trial judge along with the sentence of death, thus assuring that the jury has gone through the correct analysis in arriving at a death sentence. T.C.A. § 39–2404(g). This direction to the jury by the legislature of this state meets the requirement set forth in *Gregg v. Georgia,* 428 U.S. 153, 192, 96 S.Ct. 2909, 2934, 49 L.Ed.2d 859 (1976) that a jury be given guidance in ·determining punishment when the death penalty is a possible punishment.

> Since the members of a jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given [in the sentencing hearing] .... It seems clear, however, that the problem will be alleviated if the jury is given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision. *Gregg v. Georgia, supra,* at 192, 96 S.Ct. at 2934.

The procedure described above is the suggested procedure of the Model Penal Code § 210.6, Comment 3, at 72 (Tent. Draft No. 9, 1959), noted with approval by the United States Supreme Court in *Jurek v. Texas,* 428 U.S. 262, 271 n. 6, 96 S.Ct. 2950, 2956 n. 6, 49 L.Ed.2d 929 (1976). And, it has been held by this court to satisfy the requirements of the Constitution of the United States and the Constitution of Tennessee. *See Houston v. State,* 593 S.W.2d 267 (Tenn. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 251, 66 L.Ed.2d 117, *petition to rehear denied,* —— U.S. ——, 101 S.Ct. 797, 66 L.Ed.2d 612 (1980); *Cozzolino v. State,* 584 S.W.2d 765 (Tenn.1979).

■ This procedure was followed in the instant case with the jury finding three aggravating circumstances and no mitigating circumstances.

■ The argument by appellant that T.C.A. § 39–2404(g) makes death mandatory under certain circumstances and does not allow the jury the opportunity to show mercy, and as a result is unconstitutional, does not comport with our assessment of the effect of the statute. We pointed out in *Houston v. State, supra,* that:

> T.C.A. § 39–2404(i) and (j) set forth the aggravating and mitigating factors to be considered by the jury in the sentencing hearing, with the admonishment that *any factor, not just the specified statutory factors, may be considered in mitigation.* These circumstances are presented for the jury to consider and "weigh" in exercising its "controlled" discretion in determining what sentence should be imposed. *The jury is not required to return a mandatory verdict of death. It must consider mitigating factors.* As to the charge that the statute is vague because [it allows] the jury to "weigh" aggravating and mitigating circumstances, it must be borne in mind that the weighing of evidence is the normal function of the jury. And, where the jury is given adequate guidance as to what to consider, the requirements that the jury weigh aggravating and mitigating factors shown by the evidence does not make the statute vague and, consequently, unconstitutional. *See State v. Pierre,* 572 P.2d 1338, 1347–1348 (Utah 1977), *cert. denied,* 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978). (emphasis supplied)

■ Appellant also urges that T.C.A. § 39–2404(i)(5), one of the two aggravating circumstances found by the jury, is unconstitutionally vague and overbroad. The section of the statute under attack is as follows:

> (5) The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind.

In *Proffitt v. Florida,* 428 U.S. 242, 255–56, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976), the Supreme Court of the United States considered a similar attack on the constitutionality of an identical aggravating circumstance set forth in the Florida

death sentence statutes. The Court held that the aggravating circumstance, as construed by the Florida Supreme Court, was not impermissibly vague. The Florida Supreme Court had construed the provision to be directed at "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *State v. Dixon*, 283 So.2d 1, 9 (Fla. 1973). In *Tedder v. State*, 322 So.2d 908 (1975) the Florida court recognized that the provision was directed by its legislature at something "especially" heinous, atrocious or cruel, 322 So.2d at 910. The trial court's instructions to the jury in this case are compatible with these constructions by the Florida court, which we approve. Further, as pointed out by the state in its brief, "the factual circumstances which the jury found in the instant case, the nature of the slitting of the victim's throat, support such an interpretation."

Having again concluded that the Tennessee Death Penalty Act is constitutional and finding no prejudicial error committed in the trial, the judgment entered in the trial court of death by electrocution is affirmed. The date of the execution is set for July 15, 1981.

FONES and HARBISON, JJ., concur.

BROCK, C. J., dissents.

BROCK, Chief Justice.

I concur in the affirmance of Dicks' guilt of first degree murder, but I dissent from the sentence of death for the reasons herein set out.

I

Article I, Section 16, of the Constitution of Tennessee provides:

"That excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

The Eighth Amendment to the Constitution of the United States, applied to the states through the Fourteenth Amendment, contains a like prohibition.

Although this Court has never declared a statute to be void because it is in violation of the cruel and unusual punishment prohibition of Article I, Section 16, of the Tennessee Constitution, it long ago declared its authority and power to do so. In *Brinkley v. State*, 125 Tenn. 371, 143 S.W. 1120 (1911), the Court stated:

"However, we think that the profession generally understands, and the clear weight of modern authority is, that the courts have such power under section 16 of the Bill of Rights, and in a proper case presenting the question, it would be their undoubted duty to do so." 125 Tenn. at 382–83, 143 S.W.2d at 1122.

Moreover, we are not bound to construe a provision of our own state constitution in the same way and to the same effect as the United States Supreme Court has construed a like provision of the federal constitution. A majority of this Court expressly so held in *Miller v. State*, Tenn., 584 S.W.2d 758 (1979). In the *Miller* case we refused to construe the *ex post facto* provisions of Article I, Section 11, of the Constitution of Tennessee so as to permit the application to the defendant of a death penalty statute which had been enacted after the commission of the homicide in question, although the Supreme Court of the United States in *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), had held that the *ex post facto* provisions of Article I, Section 10, of the Constitution of the United States did not prevent the State of Florida from applying a Florida death penalty statute in similar circumstances. Speaking for the Court, Mr. Chief Justice Henry stated:

"However, as to Tennessee's Constitution, we sit as a court of last resort, subject solely to the qualification that we might not impinge upon the minimum level of protection established by Supreme Court interpretations of the federal constitutional guarantees. But state supreme courts, interpreting state constitutional provisions, may impose higher standards and stronger protections than those set by the federal constitution. It is settled law that the Supreme Court of a state has full and final power to determine the constitutionality of a state statute, proce-

dure, or course of conduct with regard to the state constitution, and this is true even where the state and federal constitutions contain similar or identical provisions. (Citations omitted.) Thus, although state courts cannot interpret their state constitution so as to *restrict* the protections afforded by the federal constitution, as interpreted by the United States Supreme Court, they may *expand* protections on the basis of a textually identical state constitutional provision.

\* \* \* \* \* \*

"We do not accept the holding of *Dobbert* as a matter of Tennessee constitutional law." 584 S.W.2d at 760.

To the same effect see *State v. Kaluna*, Hawaii, 520 P.2d 51 (1974).

## II

I concurred in the majority opinion in *Cozzolino v. State*, Tenn., 584 S.W.2d 765 (1979), which contains the following statement:

"Without detailing the precise scope of the protection afforded by that clause [cruel and unusual punishments clause of Article I, Section 16, of the Constitution of Tennessee], we hold that it places no greater restriction on the punishments that may be imposed by this state than does the federal constitution." 584 S.W.2d at 767.

In so doing I erred. But, I think it better to confess and correct that error than to perpetuate it.[1] I am unable to agree that the protection provided by the cruel and unusual punishments clause of Article I, Section 16, of the Tennessee Constitution must be reduced to the uncertainties and contradictions contained in the decisions of the United States Supreme Court involving the death penalty over the past ten years.

In *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Court struck down the death penalty as then applied on the ground that its imposition was capricious and arbitrary and, thus, unconsti-

tutional. Nine separate opinions accompanied the 5 to 4 decision. Justices Brennan and Marshall found the death penalty to be cruel and unusual under all circumstances, and thus, unconstitutional. Justices Douglas, Stewart and White condemned the death penalty because it had been applied discriminatorily, "wantonly, . . . freakishly, . . . and so infrequently that it did not serve any public purpose . . . ." Stewart, J., at 408 U.S. 310, 92 S.Ct. 2763. Chief Justice Burger and Justices Blackmun, Powell and Rehnquist dissented.

Four years later, the Court held for the first time that a state could inflict the death penalty without violating the Eighth Amendment's prohibition of cruel and unusual punishments. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). A controlling plurality of the justices approved death penalty statutes that, in their view, narrowed the class of crimes for which the death penalty would be imposed and guided the discretion of the sentencer.

Since *Gregg v. Georgia, supra,* however, just how much discretion the jury should be allowed in imposing death as a punishment has been a constant source of difficulty for the legislatures and the courts. On the one hand, notions of equal protection, due process, and fundamental fairness indicate that juries across the country should impose similar punishments for comparable crimes committed by comparable criminals. On the other hand, notions of compassion, individual justice and fairness indicate that it is "[h]ighly relevant—*if not essential*" that the sentencer consider particular circumstances such as the background and personal characteristic of each defendant. *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) [opinion of Burger, C. J., quoting *Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed.2d 1337 (1949)]. In my opinion it is impossible to reconcile this tension between consistency (sought to be achieved by guiding the

---

1. Cozzolino was granted a new sentencing hearing which resulted in his receiving a life imprisonment sentence. I did not participate in the decision of *Houston v. State*, Tenn., 593 S.W.2d 267 (1980).

jury's discretion) and individual justice (attempted by allowing the jury to exercise discretion). The states' failure to achieve this delicate balance has forced the Supreme Court to overturn a number of death penalty sentences. *See, e. g., Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (statutes providing for mandatory death sentence for certain offenses) (too little discretion); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976) (statutes providing for mandatory death sentence for certain offenses and for submission of lesser-included offenses not supported by the evidence) (too little discretion in specifying sentence; too much caprice in specifying crime); *Lockett v. Ohio, supra* (statute listing exclusive mitigating circumstances) (too little discretion); *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (unconstitutional application of statute listing aggravating circumstances) (too much discretion); *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) (statute precluding consideration of lesser-included offenses supported by the evidence) (too little discretion). The difficulty in striking a coherent balance between discretion and statutory control was pointed out in *Lockett v. Ohio, supra,* by Mr. Justice White, who chided the plurality for its "about face" since *Furman.* 438 U.S. at 622, 98 S.Ct. at 2982 (White, J., concurring in part, dissenting in part, and concurring in the judgment). And, Chief Justice Burger, reviewing the Court's recent death penalty cases, conceded that "The signals from this Court have not, however, always been easy to decipher." *Id.* at 602, 98 S.Ct. at 2963 (opinion of Burger, C. J.).

I am not able to decipher "the signals" of those decisions and thus, make no prediction whether the current Tennessee death penalty statute, or the infliction of the death penalty in this particular case, can stand muster under the Eighth Amendment as it might be construed by a majority of the Supreme Court.

Our General Assembly has made a good faith, conscientious effort to write a death penalty statute that complies with recent decisions of the Supreme Court. However, I have reached the settled conclusion that the death penalty violates Article I, Section 16, of the Constitution of Tennessee because it is a "cruel and unusual punishment."

In an opinion by Chief Justice Hennessey, the Supreme Judicial Court of Massachusetts in *District Attorney for the Suffolk District v. James Watson,* —— Mass. ——, 411 N.E.2d 1274 (1980), has concluded that the death penalty statute of that state, equivalent to the Tennessee statute in every material respect, is invalid as a cruel or unusual punishment prohibited by Article 26 of Declaration of Rights of the Constitution of Massachusetts because: "(1) the death penalty is unacceptably cruel under contemporary standards of decency, and (2) the death penalty is administered with unconstitutional arbitrariness and discrimination." *Id.* at 1275. I find the reasoning and conclusions of that opinion to be irrefutable. I believe it will stand as a landmark decision and by followed by the courts of many other jurisdictions in the years to come. I shall refer to it and quote from it extensively in this opinion.

## THE DEATH PENALTY IS A CRUEL AND UNUSUAL PUNISHMENT

### A. "Cruel and unusual"—the standard.

It must be conceded, of course, that at the time Article I, Section 16, of our state constitution was adopted in 1870 it was not considered to prohibit capital punishment. Capital punishment was employed before its adoption and has been employed since its adoption. But, as noted by the Supreme Court in *Weems v. United States,* 217 U.S. 349, 373, 30 S.Ct. 544, 551, 54 L.Ed. 793 (1910), a constitutional provision "is enacted, it is true, from an experience of evils but its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle, to be vital, must be capable of wider applications than the mischief which gave it birth." As noted by the Supreme Court of

California in *People v. Anderson*, 6 Cal.3d 628, 100 Cal.Rptr. 152, 493 P.2d 880 (1972), *cert. denied* 406 U.S. 958, 92 S.Ct. 2060, 32 L.Ed.2d 344 (1972):

> "The framers of our Constitution like those who drafted the Bill of Rights, anticipated that interpretation of the cruel and unusual punishments clause would not be static but that the clause would be applied consistently with the standards of the age in which the questioned punishment was sought to be inflicted." 493 P.2d at 893.

*See also Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958), in which the Supreme Court observed that the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Therefore, when the validity of the death penalty is drawn in question, judges cannot avoid the task of determining whether the death penalty continues to conform to the "standards of the age."[2] If it falls below that standard, it is the duty of the court to declare it to be invalid. Ever since *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803) that has been the way such questions have been decided in this country. The courts have no more authority to defer to the judgment of the legislature in determining what is a "cruel and unusual" punishment than to defer to that branch of government for a determination of what is "due" process of law or what is an "unreasonable" search and seizure. In each of these instances, the determination is a judicial one which, in our jurisprudence, resides with the courts and cannot be avoided.

What considerations enter into a determination whether the death penalty does or does not comply with contemporary moral standards? Clearly, there is not unanimity of public opinion either favoring or opposing the death penalty. However, public opinion, although relevant, is not conclusive of the issue.

> "If the judicial conclusion that a punishment is 'cruel and unusual' 'depend[ed] upon virtually unanimous condemnation of the penalty at issue,' then, '[l]ike no other constitutional provision, [the Clause's] only function would be to legitimize advances already made by the other departments and opinions already the conventional wisdom.' We know that the Framers did not envision 'so narrow a role for this basic guaranty of human rights.' " *Furman v. Georgia, supra*, 408 U.S. at 268, 92 S.Ct. at 2741 (1972) (Brennan, J., concurring), quoting from Goldberg & Dershowitz, Declaring the Death Penalty Unconstitutional, 83 Harv.L.Rev. 1773, 1782 (1970).

The Supreme Judicial Court of Massachusetts has correctly pointed out ". . . that what our society does in actuality is a much more compelling indicator of the acceptability of the death penalty than the responses citizens may give upon questioning." *Watson, supra*, 411 N.E.2d at 1282.

The last person executed in Tennessee was William Tines, on November 7, 1960. There was one execution in 1959 (Thomas Rutledge). There were none in 1958, two in 1957, and none in 1956. There were four in 1955. There were none in 1954, 1953, 1952, or 1951. No executions were carried out in the four recent administrations of Governor Frank Clement, Governor Buford Ellington, Governor Winfield Dunn and Governor Ray Blanton. Reciting a lack of executions in Massachusetts since 1948, Chief Justice Hennessey of the Massachusetts Supreme Judicial Court in *District Attorney for the*

---

2. "If we look back at history, we find that capital punishment was once thought to be the only just punishment for thieves, adulteresses, heretics, and forgers. The sentiment of justice went so far as to require the robber to have his bones broken and his still living body left to expire tied to the spokes of a wheel fixed on a pole on a scaffold. We now find such punishments revolting; we use the death penalty only to remove life, and we perform the operation in the seclusion of a prison chamber. The point is that justice is a relative concept that changes with the times. A sense of justice must exist among all people to regulate their living together. This is an immutable requirement of social life, but what justice *means* is not immutable." Sellin, "The Inevitable End of Capital Punishment," in *Capital Punishment* 241–42 (T. Sellin ed. 1967).

*Suffolk District v. Watson, supra,* made this statement:

> "The complete absence of executions in the Commonwealth through these many years indicates that in the opinion of those several Governors and others who bore the responsibility for administering the death penalty provisions and who had the most immediate appreciation of the death sentence, it was unacceptable." *Id.* 411 N.E.2d at 1282.

The above recited experience in Tennessee leads me to a similar conclusion.

I now point out certain aspects of the death penalty which, in my view, render it "cruel and unusual."

### B. Finality of the penalty.

The utter finality of the death penalty may cruelly frustrate the cause of justice. Once the prisoner has been put to death by the state there can be no relief granted although later developments in the evidence of the case or of the controlling law may show, conclusively, that the penalty was mistakenly inflicted.[3] Again, I quote from the opinion of the Supreme Judicial Court of Massachusetts in the *Watson* case:

> "The 'irreversible finality of the execution of a criminal defendant,' [*Commonwealth v. O'Neal*, 369 Mass. 242, 276 n. 1, 339 N.E.2d 676, 695 n. 1 (1975)] (Wilkins, J., concurring), could frustrate such efforts to see that justice is applied equally when changes in the law occur or when new evidence is discovered. While this court has the power to correct constitutional or other errors retroactively by ordering new trials for capital defendants whose appeals are pending or who have been fortunate enough to obtain stays of execution or commutations, it cannot, or course, raise the dead." *Watson, supra,* 411 N.E.2d at 1282.

"The calculated killing of a human being by the State involves, by its very nature, a denial of the executed person's humanity. The contrast with the plight of a person punished by imprisonment is evident. An individual in prison does not lose 'the right to have rights.' A prisoner retains, for example, the constitutional rights to the free exercise of religion, to be free of cruel and unusual punishments, and to treatment as a 'person' for purposes of due process of law and the equal protection of the laws." *Furman v. Georgia, supra,* 408 U.S. at 290, 92 S.Ct. at 2752 (1972) (Brennan, J., concurring).

"I shall ask for the abolition of the punishment of death until I have the infallibility of human judgment demonstrated to me." Thomas Jefferson (quoted in E. Block, *And May God Have Mercy* ... 1 [1962]).

### C. Infliction of Pain Upon The Prisoner.

The death penalty is now unique in its designed infliction of both mental and physical pain upon the prisoner. This was pointed out by Mr. Justice Brennan in *Furman v. Georgia, supra,* at 287–88, 92 S.Ct. at 2751, as follows:

> "Since the discontinuance of flogging as a constitutionally permissible punishment, *Jackson v. Bishop*, 404 F.2d 571 (CA 8 1968), death remains as the only punishment that may involve the conscious infliction of physical pain. In addition, we know that mental pain is an inseparable part of our practice of punishing criminals by death, for the prospect of pending execution exacts a frightful toll during the inevitable long wait between the imposition of sentence and the actual infliction of death."

*See also, People v. Anderson, supra,* 6 Cal.3d at 649, 100 Cal.Rptr. 152, 493 P.2d 880.

The barbarous nature of the death penalty and especially of the mental cruelty

---

3. The reality of the danger of convicting and punishing an innocent person is shown by our case, *Forbes v. State*, Tenn., 559 S.W.2d 318 (1977). Forbes was convicted of rape and served five years of a very long sentence in the penitentiary before he was pardoned recently by Governor Alexander after the police and the prosecuting attorney acknowledged that a mistake had been made and recommended that the Governor pardon Forbes. One shudders to think of the fate of forbes if rape had been punishable by death.

which it inflicts upon the prisoner has been vividly expressed by Justice Liacos of the Massachusetts Supreme Judicial Court, as follows:

"The imposition of the death penalty is disguised by the language and technique of abstraction. 'Indeed no one dares speak directly of the ceremony. Officials and journalists who have to talk about it, as if they were aware of both its provocative and its shameful aspects, have made up a sort of ritual language, reduced to stereotyped phrases. Hence we read at breakfast time in a corner of the newspaper that the condemned "has paid his debt to society" or that he has "atoned" or that "at five a. m. justice was done." ' A. Camus, Reflections on the Guillotine, in Resistance, Rebellion, and Death 132 (1960). Consistent with the views of Camus, of authorities cited elsewhere in this opinion and of the majority, are the experiences described by Henry Arsenault, a convicted murderer sentenced to death in this Commonwealth. *See Arsenault v. Commonwealth*, 353 Mass. 575 [233 N.W.2d 730], rev'd 393 U.S. 5 [89 S.Ct. 35, 21 L.Ed.2d 5] (1968). *See also, Commonwealth v. Devlin*, 335 Mass. 555 [141 N.E.2d 269] (1957). Arsenault is presently an inmate at the Massachusetts correctional Institution at Norfolk and has submitted a brief *pro se* as *amicus curiae*. His brief tells his story.

"For over two years, Henry Arsenault 'lived on death row feeling as if the Court's sentence were slowly being carried out.' Arsenault could not stop thinking about death. Despite several stays, he never believed he could escape execution. 'There was a day to day choking, tremulous fear that quickly became suffocating.' If he slept at all, fear of death snapped him awake sweating. His throat was clenched so tight he often could not eat. His belly cramped, and he could not move his bowels. He urinated uncontrollably. He could not keep still. And all the while a guard watched him, so he would not commit suicide. The guard was there when he had his nightmares and there when he wet his pants.

Arsenault retained neither privacy nor dignity. Apart from the guards he was alone much of the time as the day of his execution neared.

"And on the day of the execution, after three sleepless weeks and five days' inability to eat, after a night's pacing the cell, he heard the warden explain the policy of the Commonwealth—no visitors, no special last meal, and no medication. Arsenault asked the warden to let him walk to the execution on his own. The time came. He walked to the death chamber and turned toward the chair. Stopping him, the warden explained that the execution would not be for over an hour. Arsenault sat on the other side of the room as the witnesses filed in behind the one-way mirror. When the executioner tested the chair, the lights dimmed. Arsenault heard other prisoners scream. After the chaplain gave him last rites, Arsenault heard the door slam shut and the noise echoing, the clock ticking. He wet his pants. Less than half an hour before the execution, the Lieutenant Governor commuted his sentence. Arsenault's legs would not hold him up. Guards carried him back to his cell. He was trembling uncontrollably. A doctor sedated him. And he was moved off death row.

"... The raw terror and unabating stress that Henry Arsenault experienced was torture; torture in the guise of civilized business in an advanced and humane polity. This torture was not unique, but merely one degrading instance in a legacy of degradation. The ordeals of the condemned are inherent and inevitable in any system that informs the condemned person of his sentence and provides for a gap between sentence and execution. Whatever one believes about the cruelty of the death penalty itself, this violence done the prisoner's mind must afflict the conscience of enlightened government and give the civilized heart no rest.

"Death is the 'king of terrors.' *Job* 18:14 .... So deep is the fear of death and the corresponding desire for tran-

scendence that Christian thought attributes death to the fall of Adam, and the New Testament proclaims Christ's victory over death. 1 *Corinthians* 15:20, 26.

\* \* \* \* \* \*

"The condemned must confront this primal terror directly, and in the most demeaning circumstances. A condemned man knows, subject to the possibility of successful appeal or commutation, the time and manner of his death. His thoughts about death must necessarily be focused more precisely than other people's. He must wait for a specific death, not merely expect death in the abstract. Apart from cases of suicide or terminal illness, this certainty is unique to those who are sentenced to death. The State puts the question of death to the condemned person, and he must grapple with it without the consolation that he will die naturally or with his humanity intact. A condemned person experiences an extreme form of debasement." *Watson, supra*, 411 N.E.2d at 1289–92 (Liacos, J., concurring) (footnotes omitted).

In a footnote, Justice Liacos further states,

"My argument that the ordeal imposed on the condemned is cruel and unusual punishment does not depend on the existence of lengthy delays between sentence and execution. Two months—or, for that matter, one day—of torture offends the Constitution. As C. Duffy, a former warden of California's prison at San Quentin has described, 'One night on death row is too long, and the length of time spent there by [some inmates] constitutes cruelty that defies the imagination. It has always been a source of wonder to me that they didn't all go stark, raving mad.' C. Duffy & A. Hirshberg, 88 Men and 2 Women, 254 (1962)." *Id.* at 1291, n. 5 (Liacos, J., concurring).

### D. *Unnecessary killing is cruel.*

Finally, the death penalty is absolutely unnecessary as a punishment and, therefore, is cruel.[4] Society would be adequately protected from the condemned murderer by his permanent imprisonment; killing him is not necessary.

Our law recognizes only one instance in which a deliberate killing is justified, viz., one may kill another in his own or another's *necessary* self-defense. This being true, how can the whole body of individuals making up "The State" be justified in killing a person when it is unnecessary to do so for the protection of the people of the state? *See* Capital Punishment, 56 T. Sellin (1967 edition). By any modern concept of the term "cruel," the deliberate and unnecessary killing of a human being is cruel, whether done by an individual or by the State.

"In society where the force of all is mobilized against one, what principle of justice authorizes it to impose death? . . . A victor who would kill his captured enemies is called barbaric! A man who butchers a child whom he can disarm and punish seems like a monster! An accused condemned by society is like a conquered and powerless enemy; he is weaker before it than a child is before a man." Robespierre (quoted in Hornum, "Two Debates: France, 1791; England, 1956," in *Capital Punishment* 65–66 [T. Sellin ed. 1967]).

With respect to the question whether the death penalty is necessary, the Supreme Court of California, in holding that its death penalty statute violated the "cruel or unusual" punishments clause of its state constitution, said in *People v. Anderson, supra:*

"The People concede that capital punishment is cruel to the individual involved.

---

4.  "The principle that a severe punishment must not be excessive does not, of course, mean that a severe punishment is constitutional merely because it is necessary. A State could not now, for example, inflict a punishment condemned by history, for any such punishment, no matter how necessary,

would be intolerably offensive to human dignity. The point is simply that the unnecessary infliction of suffering is also offensive to human dignity." *Furman v. Georgia, supra*, 408 U.S. at 281 n. 26, 92 S.Ct. at 2748 n.26 (Brennan, J., concurring).

They argue, however, that only 'unnecessary' cruelty is constitutionally proscribed, and that if a cruel punishment can be justified it is not forbidden by article I, section 6, of the California Constitution. We need not decide here whether our Constitution permits the infliction of 'necessary' cruelty as punishment for crime, because respondent has not demonstrated that the death penalty can be justified as necessary to any state interest.

"In seeking to justify continuance of capital punishment, the People argue that it furthers three of the four acknowledged purposes of punishment. Respondent concedes that death is in no way rehabilitative, but contends that capital punishment may be legitimately imposed in retribution for serious offenses, that it serves to isolate the offender, and that the existence of the death penalty acts as a deterrent to crime. None of these purposes is shown to justify so onerous a penalty as death.

"Although vengeance or retribution has been acknowledged as a permissible purpose of punishment under the Eighth Amendment (*Williams v. New York* (1949) 337 U.S. 241, 248, 69 S.Ct. 1079 [1083], 93 L.Ed. 1337), we do not sanction punishment solely for retribution in California. (*In Re Estrada* (1965) 63 Cal.2d 740, 745, 48 Cal.Rptr. 172, 408 P.2d 948.) We are fully aware that many condemned prisoners have committed crimes of the utmost cruelty and depravity and that such persons are not entitled to the slightest sympathy from society in the administration of justice or otherwise. Nevertheless, it is incompatible with the dignity of an enlightened society to attempt to justify the taking of life for purposes of vengeance.

"Admittedly, isolation of the offender from society is a proper and often necessary goal of punishment and death does effectively serve that purpose. Society can be protected from convicted criminals, however, by far less onerous means than execution. In no sense can capital punishment be justified as 'necessary' to isolate the offender from society." 100 Cal.Rptr. at 167–68, 493 P.2d at 895–96.

I find that I am in agreement with the views thus expressed by the California Supreme Court. Life imprisonment without parole is an alternative that serves the functions of severely punishing the criminal and permanently protecting the society from the possibility of a repeated offense.

Some writers have attempted to justify the death penalty on the grounds that society needs to kill some criminals in order to deter others from potential crimes. After a century of debate, investigators and scholars are in disagreement, at best, about whether the death penalty in fact does deter crime; indeed, some argue that it has the opposite effect. To prove that the death penalty, in particular, is a deterrent would require more than proof that the possibility of punishment, in general, deters crime. The proof would have to show that there are potential crimes that are not committed because of the existence of the death penalty and that they would be committed otherwise. Such an inquiry, by its nature, would be highly speculative. In any event, my view is that, for the reasons discussed herein, the death penalty is a cruel and unusual punishment for the person upon whom it is inflicted and is, therefore, unconstitutional. Were it positively shown that the death penalty has a deterrent effect on others, it would still be unconstitutional because it is a cruel and unusual punishment for the person upon whom it is inflicted. In other words, deterrence, or the lack thereof, is irrelevant to the constitutional issue whether a particular punishment is cruel and unusual. Deterrent effect cannot save a cruel and unusual punishment.

### E. Arbitrariness and capriciousness of the penalty.

I am convinced that it is inevitable that the death penalty will be applied capricious-

ly and arbitrarily.[5]  Again, I quote approvingly from the opinion of the Massachusetts court in *Watson*:

"We know that, each year during the decades of the 1930s through the 1960s, thousands of persons were convicted of criminal homicides in states where death was an authorized punishment for those crimes.  However, death was inflicted in only a minute fraction of those cases.  'When a country of over 200 million people inflicts an unusually severe punishment no more than fifty times a year, the inference is strong that the punishment is not regularly and fairly applied.  To dispel it would indeed require a clear showing of nonarbitrary infliction.' *Furman v. Georgia*, 408 U.S. 238, 293 [92 S.Ct. 2726, 2754, 33 L.Ed.2d 346] (1972) (Brennan, J., concurring).  No rational basis can be offered to explain why the few were executed and many others were not.  It cannot be said that only the 'worst' offenders were executed.  All murderers are extreme offenders.  Fine distinctions, designed to select a very few from the many, are inescapably capricious when applied to murders and murderers.  As a consequence, the death penalty is 'wantonly and ... freakishly' inflicted. *Furman v. Georgia, supra*, at 310 [92 S.Ct. at 2763] (Stewart, J., concurring)." *Watson, supra*, 411 N.E.2d at 1283–84.

I also agree with the Massachusetts court that while unguided jury discretion is intolerable, statutory guidelines cannot cure that uncertainty entirely; the subtle distinctions in the elements of crimes can be virtually impossible to define with certainty.

"As Mr. Justice Harlan wrote in *McGautha v. California*, 402 U.S. 183, 204, 91 S.Ct. 1454, 1465, 28 L.Ed.2d 711 (1971): 'Those who have come to grips with the hard task of actually attempting to draft means of channeling capital sentencing discretion have confirmed the lesson taught by ... history ....  To identify before the fact those characteristics of criminal homicides and their perpetrators which call for the death penalty, and to express these characteristics in language which can be fairly understood and applied by the sentencing authority, appear to be tasks which are beyond present human ability.'

"A basic criterion, for example, in 'channeling' the death penalty decision lies in the choice between first and second degree murder.  Mr. Justice Cardozo said of the distinction between degrees of murder, that it is 'so obscure that no jury hearing it for the first time can fairly be expected to assimilate and understand it.  I am not at all sure that I understand it myself after trying to apply it for many years and after diligent study of what has been written in the books.  Upon the basis of this fine distinction with its obscure and mystifying psychology, scores of men have gone to their death.' Cardozo, What Medicine Can Do For Law, in Law & Literature 100–101 (1931)." *Watson, supra*, 411 N.E.2d at 1284.

I think the Massachusetts court is correct in its conclusion that even if guidelines could cure the arbitrariness in the jury's determination of the crime and the sentence, the death penalty still would be arbitrarily inflicted because of the unguided, discretionary powers exercised by others in the judicial process:

"Power to decide rests not only in juries but in police officers, prosecutors, defense counsel, and trial judges.  (Footnote omitted.)[6]  In the totality of the process, most life or death decisions will be made by these officials, unguided and uncurbed by statutory standards.  In any given case, decisions rest upon such considerations as the level of public outcry.

"*Furman* stands indifferent to the exercise of the prosecutor's 'untrammeled discretion.'  For reasons which may be valid in the context of his duties, but which do

---

5.  *See, generally*, C. Block, *Capital Punishment: The Inevitability of Caprice and Mistake* (1974); Block, *Due Process for Death: Jurek v. Texas and Companion Cases*, 26 Cath.U.L.Rev. 1 (1976).

6.  I would add Governors to this list.

not assist evenhandedness, the prosecutor in a homicide case may forego a first degree murder indictment and seek an indictment for second degree murder or a lesser charge. Also, in a first degree murder case, perhaps pursuant to plea bargaining, the prosecutor may in his uncurbed discretion *nol prosse* that part of the indictment which charges murder in the first degree. Similarly, the judge may dismiss the first degree murder charge, in his sole discretion, pursuant to accepting a plea of guilty to a lesser offense.[7]

"We do not think that our comments denigrate the general administration of criminal justice, or the good will of those who administer the system. It can be said that these officials must necessarily have these discretionary powers in the exercise of most of their functions. Nevertheless, the criminal justice system allows chance and caprice to continue to influence sentencing, and we are here dealing with the decisions as to who shall live and who shall die. With regard to the death penalty, such chance and caprice are unconstitutional under art. 26 . . . ." *Watson, supra,* 411 N.E.2d at 1285 (footnote omitted).

"We have a response to those who might argue that our comments as to arbitrariness and discrimination apply as well to all punishments, not merely to the death penalty. While other forms of punishment may also be arbitrary in some measure, the death penalty requires special scrutiny for constitutionality. 'The penalty of death differs from all other forms of criminal punishment, not in degree but in kind.' *Furman, supra,* 408 U.S. at 306, 92 S.Ct. at 2760. (Stewart, J., concurring). Accord, *Commonwealth v. O'Neal,*

369 Mass. 242, 249, 339 N.E.2d 676 (Tauro, C. J., concurring). '[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.' *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). Our society's failure to bring evenhandedness to the entire spectrum of criminal punishment calls for great and persistent effort toward improvement. However, we are not required to abandon all such punishments on constitutional grounds. At the same time, the supreme punishment of death, inflicted as it is by chance and caprice, may not stand." *Id.* 411 N.E.2d at 1286. *See also Furman v. Georgia, supra,* 408 U.S. at 286–300 and 287 n.34, 92 S.Ct. at 2750–2757 and 2751 n. 34 (Brennan, J., concurring); *Lockett v. Ohio, supra,* 438 U.S. at 604–05, 98 S.Ct. at 2964–65 (opinion of Burger, C. J.).

I would apply the foregoing reasoning to the Tennessee death penalty statute and hold that is is a cruel and unusual punishment prohibited by Article I, Section 16, of the Tennessee Constitution because, inevitably, it is arbitrarily and capriciously imposed.[8]

### Conclusion.

The death penalty issue is a very complicated one; much more could be said about the subject than I have said. I adopt the following conclusion from the opinion of the California court in *People v. Anderson, supra,* to wit:

"We have concluded that capital punishment is impermissibly cruel. It degrades and dehumanizes all who participate in

---

**7.** Two of our recent cases serve as examples: *Cozzolino v. State, supra,* and *State v. Berry,* 592 S.W.2d 553 (Tenn.1980). Both Cozzolino and Berry were convicted of first degree murder and sentenced to death. On appeal this Court ordered new trials. Upon the second trial, after a change of venue, Cozzolino's punishment was fixed at life imprisonment. After Berry's case was remanded for a new trial, his counsel and the prosecutor made a plea bargain that resulted in a sentence of life imprison-

ment. Same defendants, same crimes, same cases; but very different sentences resulted from the second proceedings.

**8.** I have treated arbitrariness and capriciousness of the infliction of the death penalty as an aspect of its being "cruel and unusual," as most courts have done. In my opinion this objection may also be considered as a lack of "due process."

its processes. It is unnecessary to any legitimate goal of the state and is incompatible with the dignity of man and the judicial process. Our conclusion that the death penalty may no longer be exacted in California consistently with article I, section 6, of our Constitution is not grounded in sympathy for those who would commit crimes of violence, but in concern for the society that diminishes itself whenever it takes the life of one of its members. Lord Chancellor Gardiner reminded the House of Lords, debating abolition of capital punishment in England: 'When we abolished the punishment for treason that you should be hanged, and then cut down while still alive, and then disembowelled while still alive, and then quartered, we did not abolish that punishment because we sympathised with traitors, but because we took the view that it was a punishment no longer consistent with our self respect.' (268 Hansard, Parliamentary Debates (5th Series) (Lords, 43d Parl., First Sess., 1964–1965) (1965) p. 703.)" 100 Cal. Rptr. at 171, 493 P.2d at 899.

I would hold that the death penalty, under all circumstances, is a cruel and unusual punishment prohibited by Article I, Section 16, of the Constitution of Tennessee. Therefore, I dissent from the imposition of the death penalty in this case.