**STATE of Tennessee, Appellee,**

v.

**Cecil C. JOHNSON, Jr., Appellant.**

Supreme Court of Tennessee.

May 3, 1982.

J. Michael Engle, Robert L. Smith, Nashville, for appellant.

Kymberly Lynn Anne Hattaway, Asst. Atty. Gen., William M. Leech, Jr., Atty. Gen. and Reporter, Nashville, for appellee.

## OPINION

COOPER, Justice.

This case is before us on direct appeal by Cecil C. Johnson, Jr., from a judgment entered in the Circuit Court of Davidson County, Tennessee. *See* T.C.A. § 39–2406. The judgment approved the jury's verdicts finding appellant guilty of three counts of murder in the first degree, two counts of assault with intent to commit murder in the first degree, and two counts of robbery accomplished with the use of a deadly weapon. The sentence imposed on each murder conviction was death by electrocution. Appellant also was sentenced to serve four consecutive life terms on the assault with intent to commit murder in the first degree and robbery convictions. On review, we find no material error in the trial record and affirm the several convictions.

The crimes for which appellant stands convicted were committed on July 5, 1980. There is evidence that on that day, at about 9:45 p. m., appellant went to the convenience market on Twelfth Avenue South in Nashville, Tennessee, which was owned and operated by Bob Bell, Jr. Appellant pointed a gun at Mr. Bell and ordered him and Lewis Smith, who was in the store working on a boat motor at the request of Mr. Bell, to go behind the store counter. Mr. Bell's twelve year old son, Bobbie Bell, was already behind the counter.

While appellant and his captives were behind the counter, a woman and two children entered the market. Appellant concealed his gun and told his captives to act naturally and to wait on the customers. As soon as the customers left, appellant ordered Bobbie Bell to fill a bag with money from the cash register; Bobbie obeyed. Appellant then searched Smith and Bell, taking Smith's billfold.

At that moment, Charles House stepped into the market, and was ordered out by appellant; House obeyed. Almost immediately thereafter, appellant began shooting his captives. Bobbie Bell was shot first. Smith threw himself on top of Bobbie to protect him from further harm, and was himself shot in the throat and hand. Appellant then walked toward Bob Bell, who was on the floor behind the counter, pointed the gun at Bell's head and pulled the trigger. Fortunately, Bell threw up his hands and the bullet hit him in the wrist, breaking it. Appellant ran from the market.

Bell got a shotgun from under the store counter, preparatory to chasing appellant. He heard two gunshots outside the market. He looked toward the front of the store and saw appellant standing beside an automobile parked at the entrance. Bell chased after appellant. As he passed the automobile, he saw that a cab driver and his passenger had been shot. The passenger was later identified as Charles House, the customer who had entered the market only moments before appellant began shooting his captives and who was acquainted with appellant. Both the cab driver, James E. Moore, and Mr. House died from a gunshot wound.

Appellant was arrested on July 6, 1980, as the result of information given police officers by Bell immediately after the robberies and murders. Subsequently, both Bell and

Lewis Smith identified appellant as the perpetrator of the crimes and testified to that effect at the trial. Debra Ann Smith, the customer who came into the market with the children, also identified appellant and placed him behind the store counter with Bell, Bell's son, and Lewis Smith.

In addition to this eyewitness testimony, appellant was tied into the crimes by the testimony of Victor Davis, who had spent most of July 5, 1980, in company with the appellant. During the police investigation, Davis gave statements to the prosecution and to the defense that tended to provide an alibi for appellant. In essence, Davis said that he and appellant were together continuously from about 3:30 p. m. on July 5, 1980, until about midnight and that at no time did they go to Bell's Market. However, four days before the trial, and after his arrest for carrying a deadly weapon and for public drunkenness, Davis gave a statement to the prosecution, which incriminated appellant. In the trial Davis, who was promised immunity from prosecution in the Bell affair, testified in accord with his last statement.

According to Davis, he and appellant left Franklin, Tennessee, about 9:25 p. m. and arrived in Nashville in the vicinity of Bell's Market shortly before 10:00 p. m. Appellant then left Davis's automobile, after stating that he was going to rob Bell and was going to try not to leave any witnesses.

Davis testified that he next saw appellant, some five minutes later, near appellant's father's house which was only a block or a block and a half from Bell's Market. At that time, appellant was carrying a sack and pistol. Appellant discarded the pistol as he got into Davis's automobile and said, "I didn't mean to shoot that boy." Davis retrieved the gun and sold it the next day for $40.00.

Davis further testified that after he picked up appellant, they went directly to appellant's father's house, arriving a little after 10:00 p. m. There, in the presence of Mr. Johnson, Sr., appellant took money from the sack, counted approximately $200.00, and gave $40.00 of it to Davis.

Appellant took the stand in his own behalf and denied being in the Bell Market on July 5, 1980. His testimony as to events of the day generally was in accord with Davis's testimony, except for the crucial minutes before 10:00 p. m. when witnesses placed appellant in Bell's Market. Appellant testified that he never left the Davis automobile on the trip from Franklin to his father's house in Nashville, and that he arrived at his father's house shortly before 10:00 p. m. Mr. Johnson, Sr., fixed the time of arrival of appellant at a few minutes before 10:00 p. m., by testifying that appellant arrived as a television program ended and the 10:00 p. m. news came on. Appellant's girl friend, who talked with appellant on the telephone while appellant was at his father's home, fixed the time as being ten to fifteen minutes before 10:00 p. m. Appellant further testified that the money counted in the presence of his father was money he had won gambling in a street game in Franklin, Tennessee.

The jury accepted the prosecution evidence, including the identifications of appellant as the person who committed the robberies and murders, and found appellant guilty of murder in the first degree in killing Robert Bell III, James E. Moore, and Charles H. House, of assault with intent to commit murder in the first degree in the shooting of Lewis Smith and Robert Bell, Jr., and of the robbery of Smith and Bell.

The appellant does not specifically challenge the sufficiency of the convicting evidence, but does insist the prosecution was guilty of improprieties which had "a cumulative effect denying the [appellant's] right to a fair trial complying with due process and hindering the effectiveness of his counsel in preparing and conducting the defense." Under this general assignment, appellant insists the prosecution violated law and ethics in coverting the crucial alibi witness, Victor Davis, into a prosecution witness hostile to the defense.

The thread of appellant's argument throughout his brief of this assignment, and in his oral argument before this court, is that Davis was a "declared witness" for the

defense; and that, having been so declared, the prosecution somehow was prohibited from questioning Davis and getting him to change his "story"—that, it was not fair to permit the defense to build an alibi based on the initial statements given by Davis and then have the prosecution get Davis to change his story shortly before trial.

It is well settled that prospective witnesses are not partisans and do not belong to either party, but should be regarded as spokesmen for the facts as they see them. *See Gammon v. State*, 506 S.W.2d 188, 190 (Tenn.Crim.App.1974). The purpose of an investigation and trial is to get to the truth. This sometimes entails the interrogation of witness on several occasions before truth is distilled in its purity. Neither party can have its investigation limited merely by a declaration that a witness will testify in behalf of the other party.

In addition to the general argument, appellant points to specific acts of the prosecution, which appellant insists were violative of both law and professional ethics. Appellant complains of the fact that the district attorney general caused Davis to be detained for questioning within a week of the trial date, the fact that Davis was questioned in the absence of his counsel, the time of day the questioning took place and Davis's physical condition, the fact that the prosecution made Davis aware of the possibility that the State would turn up evidence against Davis and move against him, and the ultimate grant of immunity to Davis from prosecution for crimes growing out of the *Bell* incident. Appellant argues that these actions by the district attorney general and his associates, violated Davis's Fourth, Fifth, and Sixth Amendment rights. We see no basis for the argument, either in fact or law. First, we find nothing in the record to show a violation of Davis's constitutional rights. The evidence shows that Davis's detention was as the result of a lawful arrest on charges of public drunkenness and the unlawful possession of a deadly weapon. The record also shows that Davis knowingly and voluntarily

waived his right to counsel when he learned that the interrogation would be limited to the *Bell* incident. On the Monday following the interrogation, Davis and his attorney went to the office of the district attorney general, where Davis repeated his statement in the presence of his counsel, had it reduced to writing, and signed it. Furthermore, when Davis testified in the trial, both parties were allowed to fully explore the circumstances of Davis's arrest and detention, the fact that Davis had changed his "story" from the one he had given earlier to the prosecution and the defense, and that the State had promised Davis immunity from prosecution for any crime predicated on the *Bell* incident. This exploration, of course, was crucial to the jury's evaluation of the credibility of Davis. Second, even if the law enforcement officials violated Davis's right to be secure in his person, his right not to be compelled to be a witness against himself, and his right to have counsel present during any interrogation, these are rights personal to Davis and can only be asserted by him and not by some other person, such as appellant, who might be adversely affected by information elicited during the detention and interrogation. *Cf. Brown v. United States*, 411 U.S. 223, 230, 93 S.Ct. 1565, 1569, 36 L.Ed.2d 208 (1973); *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *Faretta v. California*, 422 U.S. 806, 816, 95 S.Ct. 2525, 2533–34, 45 L.Ed.2d 562 (1975).

Appellant also charges that in the guise of questions and in closing argument, the prosecution made declarative statements calculated to bolster the credibility of Davis to the prejudice of the appellant. With these charges in mind, we have re-read those parts of the record cited by appellant and find no basis for the charge.

Appellant also takes issue with the fact that, in questioning Davis, the prosecution brought out the fact that Davis had been granted immunity from prosecution in exchange for testimony relative to the *Bell* incident. Appellant argues that this was misleading in that the prosecution had not taken procedural steps to insure that Davis

had immunity. Appellant does not indicate how he could be prejudiced by the action of the prosecution, nor can we see any basis for prejudice resulting from the statement that Davis had been granted immunity. Such a fact could serve only to diminish Davis's credibility in the eyes of the jury to the advantage of appellant. Furthermore, appellant's insurmountable problem in this case was not Davis's testimony, but the testimony of the three eyewitnesses, two of whom looked into the barrel of the pistol held by appellant and were shot by him.

■ Appellant further insists that the prosecution improperly withheld notice to the defense of the existence of the witness, Debra Ann Smith, until eleven days before the trial began. Interestingly enough, no complaint was directed to the prosecution's action, or rather inaction, until the motion for new trial was filed in behalf of appellant. This probably was due to the fact that the prosecution gave notice that Debra Ann Smith would be a witness within the minimum time requirement set forth in Rule 12.1(b) of the Tennessee Rules of Criminal Procedure. But whatever the reason, we now find nothing in the record to indicate that the time of notification hindered counsel's preparation for trial or his ability to adequately represent his client in the trial.

■ Appellant also takes issue with the time frame for the crimes set forth in the motion by the prosecution to require appellant to give notice of his intention to offer a defense or alibi. The time frame for the crimes set forth in the motion was "July 5, 1980, between 10:00 p. m. and 10:10 p. m." On trial, the proof indicated that the crimes were likely committed between 9:55 p. m. and 10:00 p. m. Appellant insists that he was prejudiced by the five to ten minute time differential. How he was prejudiced is not clear, since appellant did not limit his alibi evidence to the ten minute period set forth in the motion, but covered the period from 9:00 a. m. on July 5, 1980, until the following morning. This testimony necessarily would be the same for both time frames, and no prejudice could result from a five to ten minute differential between the time frame for the crimes set forth in the motion and the time frame proven by the several witnesses who testified.

■ In a general assignment of error directed to the sentencing hearing, appellant insists that evidentiary rulings by the trial court, "constitute error, deprive the jury of guidance needed to evaluate the [appellant's] mitigating circumstances, and result in an arbitrary and capricious sentence of death." In the course of discussion of this assignment, appellant insists that the trial court erred in excluding testimony of expert witnesses on the validity of the death penalty as a deterrent to crime, the moral and ethical standards of conduct of western civilization, and the relationship between youth and accountability for decision making. The experts were to testify on these issues generally, since neither of them had ever seen or spoken with the appellant, or had reviewed his record.

In this state, the legislature has provided that where it is found that the defendant is guilty of first degree murder, a second proceeding is to be held before the same jury to determine the sentence—either life imprisonment or death—to be imposed T.C.A. § 39–2404(a). The jury may impose the death penalty only upon finding that one or more aggravating circumstances, listed in the statute, are present, and further that such circumstance or circumstances are not outweighed by any mitigating circumstance. T.C.A. §§ 39–2404(g) and (i). The burden of proof rests upon the state to establish the aggravating circumstances beyond a reasonable doubt and the jury must specifically find that these outweigh any mitigating circumstances before they are justified in imposing the death penalty. T.C.A. § 39–2404(f). These separate determinations must be put in writing and given to the trial judge along with the sentence of death, thus assuring that the jury has gone through the correct analysis in arriving at a death sentence. T.C.A. § 39–2404(g).

In *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978), the Supreme Court points out that the:

Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kinds of capital cases, not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

The Court emphasized, however, in a footnote to this sentence that "nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." 98 S.Ct. at 2965 n. 12.

The legislature of this state has gone even further than is required by *Lockett v. Ohio, supra,* and has provided in T.C.A. § 39–2404(c)

> In the sentencing proceeding, *evidence may be presented as to any matter that the court deems relevant to the punishment* and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated ... below; and any evidence tending to establish or rebut any mitigating factors. *Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence.* (emphasis supplied)

The evidence tendered by the appellant and excluded by the trial court was not relevant to, nor did it have any probative value on the issue of punishment, but consisted of matters properly to be considered by the legislature in deciding whether the death penalty is ever a justified punishment for a person convicted of murder in the first degree and, if so, the circumstances under which the death penalty should be imposed. Cf. *Houston v. State,* 593 S.W.2d 267 (Tenn. 1980), *cert. denied,* 449 U.S. 891, 101 S.Ct. 251, 66 L.Ed.2d 117. The trial court thus correctly excluded the evidence.

■ In this case, with respect to each of the three murders, the jury unanimously found the following aggravating circumstance to exist:

(6) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. T.C.A. § 39–2404(i)(6)

and, in addition with respect to the killing of Robert Bell, III, the jury found the following statutory aggravating circumstances:

(3) The defendant knowingly created a great risk of death to two or more persons, other than the victims murdered during his act of murder. T.C.A. § 39–2404(i)(3)

(7) The murder was committed while the defendant was engaged in committing robbery. T.C.A. § 39–2404(i)(7)

The jury also specifically found that there were no mitigating circumstances sufficiently substantial to outweigh the statutory aggravating circumstances, and fixed appellant's sentence at death on each finding of murder in the first degree.

From our review of the record, we are of the opinion that the evidence proves appellant's guilt of the several crimes charged beyond a reasonable doubt. We are also of the opinion that the evidence supports the jury's imposition of the death penalty on its finding of aggravating circumstances listed in the Tennessee Death Penalty Act and the lack of any mitigating circumstance. Further, we are of the opinion that under the circumstances of this case, as shown by the evidence, the imposition of the death penalty by the jury was neither arbitrary nor excessive or disproportionate to the penalty imposed in similar cases.

■ Appellant sought to have the trial judge, in his instructions to the jury, inform the jury that evidence had been tendered to show that the death penalty has no deterrent effect upon crime and that the death of appellant would not benefit society or comply with moral and ethical standards of the day, and that the trial judge had excluded the evidence. Appellant insists it

was error for the trial judge not to give the requested instruction since appellant's counsel had indicated to the jury in his opening statement that such evidence would be forthcoming. We see no merit in this insistence. The trial judge is under no duty to specifically note or explain his rulings on the admissibility of evidence, nor should he call the jury's attention to evidence that has been excluded. The jury's responsibility is to decide the issues on the evidence submitted, not on what the appellant attempted to show.

Appellant takes issue with the action of the trial court in striking the affidavits of a juror and counsel for appellant, which were submitted to the court in support of appellant's motion for new trial. Appellant insists the affidavits reveal that the sentence of death in this case is the result of extraneous, prejudicial information and is the product of mistake and that appellant is entitled to a new sentencing hearing. On reading the affidavits, which were included in the record in this court, we are of the opinion that the action of the trial court was proper; and, in any event, the facts set forth in the affidavits do not show that the sentence of death was either the result of extraneous, prejudicial information, or was the product of mistake.

The substance of the juror's affidavit was that she did not understand that she could have voted for life; that she felt like she was locked in (on the death penalty); that she thought she would have to explain her vote to the judge if she voted for life; that she was afraid the judge would look at her and say, "Well, why did you do it?" that she was not afraid of the judge, but was afraid that she would be embarrassed. The juror further stated that she now believes, deep down in her heart, that Cecil Johnson did not commit the crimes.

 It is settled law in this state that a juror can not impeach her verdict, and that a new trial will not be granted upon the affidavit of a juror that she misunderstood the instructions given the jury by the trial judge, provided the instructions were correct. *Batchelor v. State*, 213 Tenn. 646,

378 S.W.2d 751, 754 (1964); *Norris v. State*, 22 Tenn. 333 (1842). *See also Montgomery v. State*, 556 S.W.2d 559 (Tenn.Crim.App. 1977). The instructions in this case were complete and clear, the jury had the instructions before them as they deliberated, and, according to the affidavit, the juror in question read the instructions. She can not now impeach her verdict.

The affidavit of counsel for appellant was based on a telephone conversation he had with juror George B. Davis. When the contents of the affidavit were made public, Mr. Davis filed a statement with the court taking issue with parts of the affidavit and clarifying others. On motion, the trial judge struck both the affidavit and Mr. Davis's statement, which was in letter form. We agree with his action. The documents show no more than that the jurors understood the court's instructions and properly applied them to the evidence as they found it, despite a reluctance to impose a death sentence. Furthermore, there is nothing in the documents to indicate that the jury based its decision on any extraneous matter or outside prejudicial influence, as charged by appellant.

 In a supplemental assignment of error, appellant questions the propriety of the trial court's excusing three jurors for cause. Appellant insists that the trial court excluded these jurors on the basis of a statement of general opposition to the death penalty, and that this was in violation of the rule set forth in *Witherspoon v. Illinois*, 391 U.S. 510, 513–514, 88 S.Ct. 1770, 1772, 20 L.Ed.2d 776 (1968), and followed by this court in *State v. Harrington*, 627 S.W.2d 345 (Tenn.1981). Our view of the position taken by the jurors on voir dire examination differs from that of the appellant. As we read the record each of the jurors clearly indicated that he would not consider the death penalty under any circumstances and would automatically vote against its imposition, whatever the evidence and whatever the instructions of the trial court. The jurors having taken this stand, it was mandatory for the trial court to excuse them from service, if the jury were to be impartial.

All assignments of error are overruled. The judgment of conviction in each case and the sentence imposed are affirmed. The death sentence will be carried out as provided by law on June 29, 1982, unless otherwise stayed or modified by appropriate authority. Costs are taxed to appellant.

HARBISON, C. J., and FONES and DROWOTA, JJ., concur.

BROCK, J., dissents in part and concurs in part.

BROCK, Justice, concurring in part and dissenting in part.

For the reasons stated in my dissent in *State v. Dicks*, Tenn., 615 S.W.2d 126 (1981), I would hold that the death penalty is unconstitutional; but, I concur in all other respects.