**STATE of Tennessee, Appellee,**

v.

**Robert Glen COE, Appellant.**

Supreme Court of Tennessee,
at Jackson.

June 27, 1983.

Opinion on Petition to Rehear
Sept. 6, 1983.

Walker Gwinn, Memphis, for appellant.

William M. Leech, Jr., Atty. Gen., Gordon W. Smith, Asst. Atty. Gen., Nashville, for appellee.

OPINION

FONES, Chief Justice.

This is a direct appeal of a death penalty case. Defendant was convicted of aggravated kidnapping, aggravated rape and murder in the first degree. The jury fixed his punishment at life on each of the first two offenses. After a bifurcated sentencing hearing, the jury found four aggravating circumstances and no mitigating circumstances and imposed the death penalty. The aggravating circumstances found were: (1) the murder was committed against a person less than twelve years of age and the defendant was over eighteen years of age; (2) the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind; (3) the murder was committed for the purpose of avoiding prosecution of the defendant; and (4) the murder was committed while the defendant was engaged in committing and fleeing after committing rape and kidnapping.

I.

The victim, Cary Medlin, eight years of age, lived in Greenfield, Tennessee with her

mother Charlotte Medlin Stout, her step-father Mickey Stout, and her step-brother Michael Stout, also eight years of age. On Saturday September 1, 1979, Labor Day Weekend, Cary and Michael went riding on their bicycles about 5:30 P.M.

Defendant was living in McKenzie, Tennessee, and working at a body shop. His wife and baby had gone to Dresden, approximately fifteen miles from McKenzie to visit his wife's sister, Vicky Box. When defendant got off work that Saturday afternoon he drove toward McKenzie to join his wife and baby. Because a bridge was out on the Liberty Road, his route to Dresden was through Greenfield.

When defendant arrived in Greenfield, he began looking around for someone to "flash" at because he "had had the urge to flash all day but could not find anyone to flash at." [1]

Defendant drove into the parking lot of a church in the neighborhood where the victim lived and parked. Soon he saw Cary and Michael on their bicycles, left the parking lot, pulled along side of them, and asked Cary to show him where her father lived. Margaret Stout, Mickey Stout's mother, lived on the street directly behind her son's house, and Cary and Michael had just paid her a visit, looking for some candy. Shortly thereafter she was looking out the window as she talked on the telephone and saw her grandson and Cary standing by their bicycles and talking to a man in a car she described as a two-toned brown four door, the top being darker than the bottom.

Defendant induced Cary and Michael to follow him, apparently from in front of Margaret Stout's house to the church parking lot. Cary got in the car with defendant and told Michael to watch her bicycle. Defendant drove around until he found a lonely, deserted gravel road that led nowhere and was well screened by trees with a fence row on each side.

Defendant's September 7, 1979 statement related that he stopped the car, exposed

[1] Defendant's statement given September 7, 1979.

himself to Cary, fondled her, starting masturbating and got on top of her, but that he did not know if his penis went into her or not. Defendant stated that when he finished his sex act, Cary told him that Jesus loved him, and he got so upset he decided to kill her. First, he tried to choke her to death with his hands but although she got blue in the face, she would not die. He then stabbed her in the neck with his pocket knife. After watching her bleed, "struggle and jerk" for a while, he left her beside the road in a dense thicket and drove away.

Local and state police were notified early Saturday evening that Cary was missing, and at first they thought she might have been kidnapped for ransom, but after receiving no demand for ransom, on Sunday afternoon an intensive search of the area was conducted and her body discovered about 2:00 P.M., approximately two miles from the town of Greenfield.

According to Donald Box, defendant's brother-in-law, defendant arrived at the Box home in Dresden about 7:45 or 8:00 P.M. Saturday night. He was driving a 1972 Ford Torino, was not intoxicated or under the influence of drugs but was nervous, seemed to have something on his mind and said to his brother-in-law, "Donnie, I would be better off dead."

Defendant, his wife, and child, returned to McKenzie on Sunday, September 2, but they spent Sunday night and Monday night with friends, Janet and Darrell Ross who lived in the Big Buck community about ten miles from McKenzie. Janet Ross testified that after visiting earlier in the day they came back about 10:00 P.M. Defendant told them that he was in trouble with the law; that he and his cousin had gone to Camden to get some marijuana and some acid; that his cousin had shot a state trooper; and that defendant had stabbed one in the throat.

On Monday, Labor Day, at defendant's request, Janet Ross and defendant's wife bought some hair dye and that night dyed defendant's hair black. He had been described by witnesses as having dirty blond hair, shoulder length. On Tuesday morning, defendant went to a used car dealership in Gleason, Tennessee and traded his 1972 Ford Torino, silver gray with a brown vinyl top, for a 1972 blue Mustang. Later that day Margaret Stout and Michael Stout were driven to the premises of the Gleason dealer where they identified the Torino as the vehicle that had been in Greenfield on Saturday afternoon and that Cary had entered and departed the church parking lot.

Barry Jones, owner of Crestview Motors, the Gleason used car dealer, testified that he had sold the 1972 four-door Ford Torino, silver/gray with brown vinyl top, to defendant in June of 1979. His wife, Althea Jones, did all of the paperwork connected with her husband's used car business. She testified that she wrote up the June sale of the Ford Torino to defendant and that she remembered that he had dirty blond hair at that time; that she saw him again on the morning of September 4, and wrote up the trade of the Torino for the blue Mustang at approximately 10:00 A.M.; that she noticed that his hair had been dyed black; that there were black smudge marks on his forehead; and that it was an obviously sloppy dye job. She testified that her husband left while she was writing up the papers and that after defendant and his friend left, the chief-of-police of Gleason came by and asked if they had traded cars with anyone. She told him about the trade with defendant and showed him the Ford Torino. The police chief made a telephone call and then requested that the Ford Torino be locked up and not shown to anyone except law officers. Mrs. Jones testified that shortly thereafter the place was "covered up with law officers" looking at the car and that a lady and a little boy came by and were shown the car by the law officers.

Darrell Ross was with defendant when he traded the gray-brown Torino for the blue Mustang Tuesday morning, when defendant went to the bus station in Huntingdon to buy a bus ticket that afternoon and still

later when defendant returned to the bus station to leave for Marietta, Georgia. Defendant was arrested at the Huntingdon bus station. Defendant had identification tags on his baggage and the name thereon was James Watson.

Agent Daniel and Inspector Blackwell transported defendant from Huntingdon to the Weakley County Jail in Dresden. Daniel testified that they did not question defendant during the trip; that when they arrived and turned defendant over to the sheriff, they went down the hall, spoke briefly to the District Attorney seeking to find out if defendant's wife had been interrogated, then returned to the sheriff's office where defendant asked to talk to Daniel in private. This occurred seven or eight minutes after their arrival at the Weakley County Jail. When Daniel and defendant were alone, defendant said, "I did it," and in response to the question, "You did what, Robert?" he said, "I am the one that killed that little girl." With Inspector Blackwell also present, defendant then consented to talk to Daniel on tape. The tape recording was played in open court in the presence and hearing of the jury and revealed that the questioning began at 7:49 P.M. on September 4, 1979, at the Weakley County Jail.

Defendant's responses to Daniel's questions revealed that he went to Greenfield, saw a little girl and a little boy on bicycles; that he stopped them and told her that he was looking for her daddy in order to lure her into the car with him, having been unsuccessful in several attempts at flashing; that he drove and that the little girl and boy rode their bicycles to a church where she left her bicycle and got in the car with him and they drove away from the church. Those details were identical to those related by little Michael Stout. In the taped statement he also told of driving around until he "found that gravel road;" that after he had raped the little girl and she told him that Jesus loved him, he choked her and stabbed her with his pocket knife.

The next day, September 5, 1979, Daniel and Blackwell went to the Weakley County Jail, read defendant his rights again, and he agreed to accompany them in a State car and show them what he did on the previous Saturday afternoon. Defendant directed the officers to the church in Greenfield where the victim got in his car and along the route he took from the church to the murder scene, that is, the gravel lane off Bean Switch Road. While on that route defendant pointed out a house that was close to the road that he had passed on Saturday with the victim in the car and that led to a ball park where he turned around and came back by the same house. He told Daniel that there was a man sitting on the porch that "will remember me or my car."

Herbert Clement, aged eighty-five, testified that he lived in that house about a mile out of Greenfield; that he was sitting on his porch between 5:30 and 6:00 P.M. on Saturday afternoon, September 1, 1979, when a car drove by going south to the ball park and then came back by going north; that he recognized the little girl passenger because he had seen her riding her bicycle on previous occasions; and that he identified the victim, Cary Medlin, from her photograph as the passenger in the car. He was unable to describe the car or to describe the man driving it.

Doctor James Spencer Bell, a board certified pathologist and Chief Deputy, Shelby County and State Medical Examiner, testified that he performed an autopsy on the body of Cary Medlin on September 3 and 4, 1979. He found evidence of manual strangulation and a stab wound to the neck that cut the carotid artery and jugular vein, either of which could have produced death. It was his opinion that both the strangulation and the stabbing were applied while Cary was alive, that she "lived a short time after the application of these two and death then resulted." He found "a laceration of the hymenal ring and a tear and abrasion extending up the vaginal canal into the

internal aspects of the body." Bruises and lacerations were also found in the anal area and swabs were taken from both the vaginal and anal areas. He testified that the bruises and lacerations in the vaginal and anal areas were "live" lesions that were inflicted prior to death.

A forensic serologist testified that she analyzed the swabs taken by Dr. Bell from the body of the victim and found the presence of spermatozoa upon testing the matter upon the vaginal and anal swabs.

## II.

■ Defendant contends that admission of the statement given by defendant on September 7, 1979, and implicitly the tape, wherein defendant confessed, was erroneous because the State had failed to prove probable cause for arresting defendant at the Huntingdon bus station and therefore the confession was the product of an illegal arrest. There is no merit to that issue.

Alvin Daniel testified that he was the Tennessee Bureau of Investigation agent in charge of the investigation of Cary Medlin's murder. He testified that a composite drawing of the suspect and a description of the car was publicized by the media; that he received information that the description bore a likeness to defendant who was reported to be a resident of McKenzie and had a vehicle like the one described as driven by the suspect; that agents were dispatched to McKenzie who learned that defendant had traded his car at Crestview Motors in Gleason, a town about eight or ten miles from McKenzie; that he telephoned Crestview Motors and learned that defendant had traded his two toned Ford Torino for a blue Mustang; and that the person who traded the car showed evidence of having recently dyed his hair black. Daniel then had Margaret Stout and Michael Stout taken to Gleason and they identified the Torino as the vehicle they had seen Saturday in Greenfield and in which Michael had last seen the victim leave the church parking lot. Daniel then received a

report that two agents had stopped a blue Mustang occupied by Darrell Ross and Tammy Coe, defendant's wife, and they reported that they had driven defendant to the bus station in Huntingdon, that he had dyed his hair black and was leaving town. Daniel then broadcast a directive that defendant be arrested at the bus station in Huntingdon. We hold that abundant probable cause existed to order the arrest and to arrest defendant without a warrant. The officers responding to Daniel's request were entitled to assume that he had information constituting probable cause to order the arrest. *C.f., Whiteley v. Warden, Wyoming State Penitentiary,* 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971).

## III.

■ Defendant's argument that the evidence was insufficient to support the guilty verdict is predicated principally on the allegation that the State relied ninety-nine percent on Coe's actions and statements after the fact which, it is said, was unreliable because Coe is a mentally disturbed individual with bizarre fantasies and weird behavior.

The jury rejected defendant's plea of insanity and that finding was supported by overwhelming lay and expert testimony. His wife Tammy, his sister-in-law and brother-in-law, Vickie and Donald Box, and his friends Janet and Darrell Ross, the persons he spent all of his time with for three days and nights immediately following the murder, testified without exception that his behavior was normal except for concern that he might be apprehended by police— which he accounted for to them by relating the false story that he and his cousin had had an encounter with two state troopers.

It is true that Coe's actions and statements after the crime point unerringly to his guilt. The reliability of his statements was greatly enhanced by identical fact testimony from other eye-witnesses to the same events. The recitation of evidence in section one of this opinion speaks for itself

on the issue of the sufficiency of the evidence to convince any rational trier of fact of the guilt of Robert Glen Coe of kidnapping, rape, and murder. We find that the evidence of defendant's guilt fully satisfied the standard prescribed in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and T.R.A.P. 13(e).

## IV.

Defendant insisted that the indictment should have been dismissed because the grand jury in Weakley County that returned it did not represent a fair cross-section of the community. Defendant attempted to show that women were substantially under-represented and had been for many years systematically excluded.

Defendant does not challenge the composition of the petit jury venire. Proof was adduced that defendant's grand jury pool consisted of two hundred women, five hundred men, or 70.41% male, 29.59% female. Three women and ten men served on the grand jury that indicted defendant. The three preceding grand jury pools had female percentages of 42%, 37.77% and 22.35%. The population of Weakley County eligible for jury service was shown to be 50.82% female based upon the 1970 census. The testimony of the jury commissioners disclosed that they choose the jurors from the voter registration lists, generally selected people they or others knew that met the statutory criteria, divided their selections proportionately within the alphabet, and testified they specifically sought females, blacks, and young voters in an amount proportionate to the county population.

The State contends that defendant does not have standing to challenge the exclusion of women from grand jury service. The State's position, in summary, is that the composition of grand juries in State courts is not subject to challenge as violative of the Sixth or Fourteenth Amendments on the grounds of gender discrimination, as distinguished from racial discrimination, with the exception that an equal protection challenge could be mounted by a member of the group against whom there is alleged discrimination. This, of course, excludes a challenge by a male defendant of female discrimination from service upon the grand jury.

The State relies primarily upon *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). There the U.S. Supreme Court had under consideration the identical challenge before us, that of a male complaining of constitutionally improper exclusion of women from grand jury service. The Supreme Court denied relief to Alexander and made the following comments on the state of the law applicable to his constitutional claims:

> This claim is novel in this Court and, when urged by a male, finds no support in our past cases. The strong constitutional and statutory policy against racial discrimination has permitted Negro defendants in criminal cases to challenge the systematic exclusion of Negroes from the grand juries that indicted them. Also, those groups arbitrarily excluded from grand or petit jury service are themselves afforded an appropriate remedy. Cf. *Carter v. Jury Commission of Greene County* [396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549], *supra.* But there is nothing in past adjudications suggesting that petitioner himself has been denied equal protection by the alleged exclusion of women from grand jury service. Although the Due Process Clause guarantees petitioner a fair trial, it does not require the States to observe the Fifth Amendment's provision for presentment or indictment by a grand jury. In *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), the Court held that because trial by jury in criminal cases under the Sixth Amendment is "fundamental to the American scheme of justice," id., at 149, 88 S.Ct., at 1447, such a right was guaranteed to defendants in state courts by the Fourteenth Amendment, but the Court has never held that

federal concepts of a "grand jury," binding on the federal courts under the Fifth Amendment, are obligatory for the States. *Hurtado v. California;* 110 U.S. 516, 538, 4 S.Ct. 111, 122, 28 L.Ed. 232 (1884). *Id.* 405 U.S. at 633, 92 S.Ct. at 1226–1227.

Also, in *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), the Supreme Court held that:

> In order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial under-representation of his race or of the identifiable group to which he belongs. *Id.* at 494, 97 S.Ct. at 1280.

Defendant contends that *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) supports his assertion that he may challenge the exclusion of women from grand jury service. In *Taylor,* a male alleged gender discrimination, that is, the exclusion of women from the *petit* jury venire. In our opinion *Taylor* did not alter the pronouncements quoted above from *Alexander* and *Castaneda* with respect to *gender* discrimination in the composition of *grand* juries. In defendant's reply brief he directs our attention to a footnote in *Alexander v. Louisiana, supra* at 626 fn. 3, 92 S.Ct. at 1223, fn. 3, which reads in part as follows:

> The principles that apply to the systematic exclusion of potential jurors on the ground of race are essentially the same for grand juries and for petit juries, however.

The accuracy of that statement is not questioned but defendant Coe's attack is based upon gender discrimination, not racial discrimination.[2]

■ We hold that defendant lacks standing to challenge the grand jury composition in Weakley County on the basis

that women are systematically excluded. We are also of the opinion that if we considered the claim on its merits the proof did not make out a case of constitutionally impermissible systematic exclusion. The proof adduced did not support a finding of the requisite elements of substantial under-representation as a result of systematic exclusion in the grand jury selection process. Also there was no showing of discriminatory intent.

## V.

■ Defendant contends that the indictment should be dismissed because the District Attorney General was present during the grand jury proceedings on December 11, 1979.

When defendant's motion to dismiss came on for hearing in the trial court, defendant's counsel stated that he assumed it would be up to the District Attorney General to state what took place during the grand jury proceedings. The District Attorney General's response was simply that the State denied that defendant was prejudiced by anything that occurred at the grand jury proceedings.

There being no evidence in this record of what transpired during the proceedings or when the vote was taken on the indictment, we must sustain the action of the trial judge in overruling defendant's motion, for failure to show prejudice. *See, e.g., Tiller v. State,* 600 S.W.2d 709 (Tenn.1980).

## VI.

Defendant's next issue asserts that the trial judge erred in overruling his motion to allow individual voir dire of each prospective juror out of the presence and hearing of other jurors.

The trial judge clearly indicated that if, as the voir dire examination progressed, it appeared appropriate to conduct individual voir dire he would do so.

2. For a more detailed analysis of the United States Supreme Court cases on the issue of

standing involved here, see *Beal v. Rose,* 532 F.Supp. 306 (M.D.Tenn.1981).

Defendant points to the "tremendous" number of jurors that were excused on the basis that they had made up their minds about the case based on pre-trial publicity. Venue was removed from Weakley County to Obion County on May 5, 1980. Jury selection began in Obion County on May 19, 1980, and continued until May 27, when defendant again moved for a change of venue which was granted. The trial began in Shelby County on February 10, 1981. In spite of the fact that a number of Shelby County jurors were excused because they were equivocal about the effect of pre-trial publicity, nothing inflammatory nor prejudicial to defendant was revealed during the voir dire.

■ We have carefully reviewed the extensive voir dire examination as recorded in the transcript. In our opinion, an impartial jury was selected, properly committed to try defendant only on the evidence presented at the trial, uninfluenced by any pre-trial publicity or any information imparted to the venire during the voir dire. The trial judge has wide discretion in the examination of prospective jurors and his action will not be disturbed unless there is an abuse of discretion. *See, e.g., State v. Jefferson,* 529 S.W.2d 674 (Tenn.1975).

### VII.

■ Defendant insists that the trial judge erred in allowing the State to ask jurors if they believed that anyone who would harm an eight-year-old child, "would have to be insane to do a thing like that," and in excusing for cause one or more jurors who appeared to entertain a pre-disposition to conclude from that fact alone that insanity was indicated.

Defendant argues that such questions committed the jurors, in advance of hearing the evidence, "to the proposition that they would not feel that the defendant was insane, ... by reason of the fact that he deliberately killed an eight-year-old girl."

We disagree that the State's questioning resulted in any commitment beyond the ap-propriate willingness to decide the issue of insanity on all of the evidence adduced at the trial, free of any preconceived notion that the mere fact of harming an eight-year-old child constituted prima facie evidence justifying a presumption of insanity. This issue has no merit.

### VIII.

■ Defendant says the trial court erred, "in trying this case as a common-law pre-meditated murder charge after stating in clear and unequivocal terms, prior to the voir dire examination of the jurors, that he would not charge on common-law premeditated murder."

The first count of the indictment returned by the Weakley County grand jury charges defendant with both common-law premeditated murder and felony murder. Defendant's brief concedes that and also makes the following concession:

"We are not even arguing that the State, with the consent of the defendant, could narrow the issue to felony murder."

On the day the case was set for trial in Shelby County and before any jurors were brought into the courtroom, the trial judge and counsel were going over a number of preliminary matters and the trial judge observed that the first count of the indictment charged both common-law murder in the first degree and felony murder and that in Shelby County, the practice was to charge common-law premeditated murder and felony murder in two separate counts. The Weakley County prosecutor indicated the State was proceeding only on the felony murder count, but the Shelby County prosecutor said he understood the State was proceeding on both common-law and felony murder. At that point the trial judge said that he would "proceed" on the assumption that there was a one count indictment charging felony murder.

After the jury was selected but before any testimony was presented, out of the presence of the jury the trial judge in-

formed counsel that he would not be bound by the State's election to proceed only on felony murder and that he might charge common-law murder in the first degree; that it worried him not to "charge on something that was set forth in the indictment. Clearly, your common-law count of premeditation is set forth."

The State did not examine the jury on premeditation. Defendant has cited no authority nor suggested how he was prejudiced by the failure to examine the jury on premeditation or what the examination would have involved. The proof in this case on the element of premeditation was known in advance and consisted of defendant's written and taped statements, plus the dual causes of death, to wit: strangulation and stabbing. In our opinion, any emphasis on premeditation during voir dire would not have been advantageous to defendant. We find no merit in this issue and it is overruled.

### IX.

Defendant says that the crime of rape was used to convict him of felony murder and that to use the same felony and convict him of rape violated the double jeopardy provisions of the State and Federal Constitutions.

Defendant argues that he could not have been convicted of common-law murder because of the same sequence of events at the trial that are stated in section VII of this opinion, therefore double use of the felony rape has impermissibly occurred. That assumption is erroneous. The jury returned a general verdict. T.C.A. § 40–18–111 provides that, "A general verdict of guilty will be sustained if there is any one good count in the indictment sustained by proof, although the other counts may be fatally defective." This record contains proof of premeditation beyond a reasonable doubt, allowing the courts to sustain a conviction of defendant for common-law murder and the felony of rape. In *Briggs v. State,* 573 S.W.2d 157 (Tenn.1978), the jury returned a

special verdict, expressly finding defendant guilty of murder in the perpetration of a robbery. We held that the conviction of robbery could not stand because of the jury's special verdict but also noted that if a general verdict had been returned, defendant having been indicted for both common-law and felony murder, convictions of common-law murder and the felony of robbery could have been upheld. 573 S.W.2d at 158.

### X.

Defendant contends that the trial judge erred in overruling defendant's objection and in allowing the State to replay the entire taped interview of defendant by T.B.I. Agent Daniel during the State's closing argument. As defendant readily concedes, the trial judge has broad discretion in what counsel may be allowed to do in closing argument and will not be adjudged in error absent an abuse of discretion. *State v. Sutton,* 562 S.W.2d 820, 823 (Tenn.1978). We agree with defendant that the trial judge abused his discretion in allowing the State to replay the tape. However, our reason for finding the trial judge in error differs from that of defendant. Defendant asserts that it was improperly allowed because its sole purpose was to "emotionally inflame the jury against the defendant so the jury would kill him." In our opinion, the taped statement was wholly lacking in emotional impact, too long and too boring to achieve the result asserted by defendant. We hold that it was an abuse of discretion because it greatly exceeded in quantity the appropriate use in closing argument of exhibits, quotations from a transcript of testimony, and extracts from statements of parties or witnesses or like material. Nevertheless, we are convinced that it was an error that was harmless beyond a reasonable doubt. In our opinion, it was the overwhelming evidence that convicted defendant, not the replaying of the tape during closing argument.

### XI.

Defendant asserts that the sentence of death imposed by the jury was excessive

and disproportionate to the penalty imposed in similar cases.

Defendant argues that, "at least in modern history," no one has been sentenced to death who has spent over two years in a mental institution. Defendant further says that of ninety trial judge reports on cases wherein the death penalty was sought, eight of the defendants apparently had personality disorders and only one of the eight, Ronald Rickman, was sentenced to death. *See State v. Groseclose,* 615 S.W.2d 142 (Tenn.1981).

 From our review of this case, including the trial judge reports and cases mentioned, we are of the opinion that the imposition of the death penalty by the jury was neither excessive nor disproportionate to the penalty imposed in similar cases. *See, e.g., State v. Johnson,* 632 S.W.2d 542, 548 (Tenn.1982).

### XII.

 Defendant says the evidence does not support the finding of the jury that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest for prosecution of the defendant or another.

This contention was primarily based upon defendant's assertion that the jury could not accept part of defendant's confession and reject the part wherein defendant said he killed the victim because she said that Jesus loved him.

There can be no doubt from the circumstances of this case that the victim, if she had lived, could have identified defendant as the man who kidnapped and raped her and that therefore he had a strong motivation to silence her forever as a witness. The record also revealed that defendant frequently told false stories and made up false events. Several members of the victim's family testified that it would have been out of character for Cary Medlin to make the statement ascribed to her by de-

fendant. In our opinion, the evidence supports the jury's finding of this aggravating circumstance beyond a reasonable doubt and we find no merit in this issue.

### XIII.

Defendant's contention that the Tennessee death penalty statutes are unconstitutional has no merit, having been considered and overruled in several prior cases. *See, e.g., State v. Austin,* 618 S.W.2d 738 (Tenn. 1981).

The judgment of conviction of the three offenses and the sentences imposed in the trial court are affirmed. The death sentence will be carried out as provided by law on the tenth (10th) day of October, 1983, unless stayed by appropriate authority. Costs are adjudged against defendant.

COOPER, HARBISON and DROWOTA, JJ., concur.

BROCK, Justice concurring in part and dissenting in part.

I concur in the opinion of the Court in all respects except the constitutionality of the death penalty. With respect to the constitutionality of the death penalty, I adhere to my views as set out in my dissenting opinion in *State v. Dicks,* Tenn., 615 S.W.2d 126, 132 (1981).

### OPINION ON PETITION TO REHEAR

FONES, Chief Justice.

A petition to rehear has been filed on behalf of Robert Glen Coe, has been given careful consideration by the Court and found to be without merit.

The petition is respectfully denied.