IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JULY SESSION 1997



**FILED**

November 25, 1997

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE | ) | C.C.A. 01C01-9610-CR-00442 |
| Appellee, | ) | |
| | ) | DAVIDSON COUNTY |
| v. | ) | |
| | ) | Hon. J. Randall Wyatt, Jr., Judge |
| CECIL C. JOHNSON, JR. | ) | |
| | ) | (Post-Conviction Relief) |
| Appellant. | ) | |
| | ) | |

FOR THE APPELLANT

James F. Sanders
Neal & Harwell
2000 First Union Tower
150 Fourth Avenue North
Nashville, TN. 37219

James G. Thomas
Neal & Hartwell
2000 First Union Tower
150 Fourth Avenue North
Nashville, TN. 37219

George H. Cate, III
Neal & Hartwell
2000 First Union Tower
150 Fourth Avenue North
Nashville, TN. 37219

FOR THE APPELLEE

Charles W. Burson
Attorney General & Reporter

Glenn R. Pruden
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN. 37243-0493

John P Cauley
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN. 37243-0493

Victor S. Johnson, III
District Attorney General
Washington Square, Suite 500
222 Second Avenue North
Nashville, TN. 37201-1649

Steve R. Dozier
Assistant District Attorney General
Washington Square, Suite 500
222 Second Avenue North
Nashville, TN. 37201-1649

OPINION FILED:_____

AFFIRMED

WILLIAM M. BARKER, JUDGE

**OPINION**

The appellant, Cecil C. Johnson, Jr., appeals the Davidson County Criminal Court's dismissal of his second post-conviction petition. On appeal, he contends that: (1) The trial court erred in finding that the evidence withheld by the prosecution at trial was not material under Brady v. Maryland; (2) The trial court erred in failing to set aside the appellant's convictions because the jury instructions at trial did not properly define the "reasonable doubt" standard; (3) The trial court erred in failing to set aside the appellant's two first-degree murder convictions because the jury instructions at trial improperly merged the "premeditation" and "deliberation" elements of first degree murder; and (4) The cumulative effect of the claims in the second post-conviction petition, when viewed together with the claims previously asserted in the first petition, calls for a new trial.

After a careful review of the record, we find no error and affirm the judgment of the trial court.

**FACTUAL BACKGROUND**

In 1981, the appellant was convicted by a jury of three counts of first degree murder, two counts of assault with intent to commit murder, and two counts of armed robbery. He was sentenced to death by the jury on each count of first degree murder and he received consecutive life sentences on the three remaining counts. Our supreme court affirmed his convictions and sentences in his direct appeal in 1982.[1] The facts surrounding his offenses were described in the direct appeal as follows:

> The crimes for which appellant stands convicted were committed on July 5, 1980. There is evidence that on that day, at about 9:45 p.m., appellant went to the convenience market on Twelfth Avenue South in Nashville, Tennessee, which was owned and operated by Bob Bell, Jr. Appellant pointed a gun at Mr. Bell and ordered him and Lewis Smith, who was in the store working on a boat motor at the request of Mr. Bell, to go behind the store counter. Mr Bell's twelve year old son, Bobbie Bell, was already behind the counter.

---

[1]Following our supreme court's decision, the United States Supreme Court denied the appellant's petition for writ of certiorari. Johnson v. Tennessee, 459 U.S. 882 (1982).

While appellant and his captives were behind the counter, a woman and two children entered the market. Appellant concealed his gun and told his captives to act naturally and to wait on the customers. As soon as the customers left, appellant ordered Bobbie Bell to fill a bag with money from the cash register; Bobbie obeyed. Appellant then searched Smith and Bell, taking Smith's billfold.

At that moment, Charles House stepped into the market, and was ordered out by appellant; House obeyed. Almost immediately thereafter, appellant began shooting his captives. Bobbie Bell was shot first [and killed]. Smith threw himself on top of Bobbie to protect him from further harm, and was himself shot in the throat and hand. Appellant then walked toward Bob Bell, who was on the floor behind the counter, pointed the gun at Bell's head and pulled the trigger. Fortunately, Bell threw up his hands and the bullet hit him in the wrist, breaking it. Appellant ran from the market.

Bell got a shotgun from under the store counter, preparatory to chasing appellant. He heard two gunshots outside the market. He looked toward the front of the store and saw appellant standing beside an automobile parked at the entrance. Bell chased after appellant. As he passed the automobile, he saw that a cab driver and his passenger had been shot. The passenger was later identified as Charles House, the customer who had entered the market only moments before appellant began shooting his captives and who was acquainted with appellant. Both the cab driver, James E. Moore, and Mr. House died from a gunshot wound.

Appellant was arrested on July 6, 1980, as the result of information given police officers by Bell immediately after the robberies and murders. Subsequently, both Bell and Lewis Smith identified appellant as the perpetrator of the crimes and testified to that effect at the trial. Debra Ann Smith, the customer who came into the market with the children, also [testified and] identified appellant and placed him behind the store counter with Bell, Bell's son, and Lewis Smith.

In addition to this eyewitness testimony, appellant was tied into the crimes by the testimony of Victor Davis, who had spent most of July 5, 1980, in the company with the appellant. During the police investigation, Davis gave statements to the prosecution and to the defense that tended to provide an alibi for appellant. In essence, Davis said that he and appellant were together continuously from about 3:30 p.m. on July 5, 1980, until about midnight and that at no time did they go to Bell's market. However, four days before the trial, and after his arrest for carrying a deadly weapon and for public drunkenness, Davis gave a statement to the prosecution, which incriminated appellant. In the trial, Davis, who was promised immunity from prosecution in the Bell affair, testified in accord with his last statement.

According to Davis, he and appellant left Franklin, Tennessee about 9:25 p.m. and arrived in Nashville in the vicinity of Bell's Market shortly before 10:00 p.m. Appellant then left Davis' automobile, after stating that he was going to rob Bell and was going to try not to leave any witnesses.

Davis testified that he next saw appellant some five minutes later,

near appellant's father's house which was only a block or a block and a half from Bell's Market. At that time, appellant was carrying a sack and a pistol. Appellant discarded the pistol as he got into Davis's automobile and said, "I didn't mean to shoot that boy." Davis retrieved the gun and sold it the next day for $40.00.

Davis further testified that after he picked up appellant, they went directly to appellant's father's house, arriving a little after 10:00 p.m. There, in the presence of Mr. Johnson, Sr., appellant took money from the sack, counted approximately $200.00, and gave $40.00 of it to Davis.

Appellant took the stand in his own behalf and denied being in the Bell Market on July 5, 1980. His testimony as to events of the day generally was in accord with Davis' testimony except for the crucial minutes before 10:00 p.m. when witnesses placed appellant in Bell's Market. Appellant testified that he never left the Davis automobile on the trip from Franklin to his father's house in Nashville, and that he arrived at his father's house shortly before 10:00 p.m. Mr. Johnson, Sr., fixed the time of arrival of appellant at a few minutes before 10:00 p.m. by testifying that appellant arrived as a television program ended and the 10:00 p.m. news came on. Appellant's girl friend, who talked with appellant on the telephone while appellant was at his father's home, [testified and] fixed the time as being ten to fifteen minutes before 10:00 p.m. Appellant further testified that the money counted in the presence of his father was money he had won gambling in a street game in Franklin, Tennessee.

See State v. Johnson, 632 S.W.2d 542, 544-45 (Tenn. 1982).

The appellant filed his first post-conviction petition in 1983 raising thirty two grounds for relief. The trial court denied his petition and he subsequently appealed to this Court. We affirmed the trial court's judgment in part, but reversed and remanded the case for resentencing on the first degree murder convictions.[2] In 1990, the supreme court reversed this Court's decision to remand for a new sentencing hearing, reinstated the death sentences, and affirmed the denial of relief on the appellant's other alleged grounds.[3]

The appellant filed his second post-conviction petition in February 1995 after

---

[2]See Cecil C. Johnson v. State, No. 83-241-III (Tenn. Crim. App., at Nashville, Jan. 20, 1988), *per. app. granted* (Tenn. 1988).

[3]See Johnson v. State, 797 S.W.2d 578, 579-582 (Tenn. 1990). After our supreme court denied the appellant's petition for a rehearing on January 14, 1991, the appellant filed a petition for Writ of Habeas Corpus in the United States District Court for the Middle District of Tennessee. That petition is currently pending.

4

receiving information in 1992 pursuant to a request under the Tennessee Open Records Act. In his petition, the appellant alleged that: (1) the prosecution suppressed exculpatory and material evidence at trial, warranting a new trial under Brady v. Maryland; (2) the jury instructions did not properly define the "reasonable doubt" standard; (3) the jury instructions improperly merged the "premeditation" and "deliberation" elements of first degree murder; and (4) the cumulative effect of the claims in the second post-conviction petition, when viewed together with the claims previously asserted in the first petition, called for a new trial. The appellant had the burden of proving those allegations by a preponderance of the evidence. See McBee v. State, 655 S.W.2d 191, 195 (Tenn. Crim. App. 1987).[4]

The trial court held an evidentiary hearing and found that: (1) the evidence withheld by the prosecution at trial was not material under Brady v. Maryland; (2) the jury instruction pertaining to "reasonable doubt" properly reflected the evidentiary certainty required by "due process" in the federal and state constitutions; (3) the jury instruction on "premeditation" and "deliberation" did not violate the appellant's constitutional rights; and (4) the past and current claims raised by the appellant did not create a cumulative effect warranting a new trial.

The judgment of the trial court is affirmed.

## ANALYSIS

The appellant first contends that the evidence withheld by the prosecution at trial was material and warrants a new trial under Brady v. Maryland. This issue is without merit.

At the evidentiary hearing, the appellant introduced seven documents, marked as exhibits one through seven, to demonstrate a Brady violation. Exhibit one is a July 6, 1980 report by Detective Jerry Moore of the Nashville Metropolitan Police

---

[4]If the appellant had filed his petition after May 10, 1995, he would have been subject to the 1995 Post Conviction Procedure Act. Tenn. Code Ann. §§ 40-30-201 -- 310 (1996 Supp.). Tennessee Code Annotated section 40-30-210 (f) (1996 Supp.) requires petitioners to prove their allegations of fact by clear and convincing evidence.

Department ("NMPD") in which Robert Bell stated that the assailant had no facial hair. Exhibits two through four concern separate police interviews of the eyewitness, Louis Smith, taken between July 5 and July 11, 1980, in which Smith indicated that he did not get a good look at the assailant.[5] Exhibit five is a pleading from the file of the District Attorney's office in the case of State v. Louis Edgar Smith, No. C6175-A. Exhibit six is a July 6, 1980 report by Detective William Robeck of the NMPD in which Louis Smith describes several customers who entered Bell's Market during the robbery. Additionally, that report contains information regarding Smith's ability to identify the assailant from a photographic line up. Lastly, exhibit seven is a medical report prepared by Doctor Robert Stein at the Baptist Hospital in which Doctor Stein stated that Robert Bell had a history of "some mental instability."

The appellant relies on the landmark case of Brady v. Maryland[6] to assert that the State's suppression of the evidence in exhibits one through seven violated due process. In Brady, the United States Supreme Court held that the prosecution has a constitutional duty to furnish the defendant with any exculpatory evidence concerning the defendant's guilt or innocence and possible punishment. See 373 U.S. at 86. To establish a violation under Brady, the defendant must prove by a preponderance of the evidence that the prosecution suppressed evidence at trial, the evidence was favorable to the defendant, and the evidence was material.[7]

In this case, the State concedes that the evidence contained in exhibits one through seven was exculpatory, favorable to the appellant, and improperly suppressed at trial. The issue on appeal is whether the evidence was material.

---

[5]Exhibit two is a July 11, 1980 report by Officer J. Dobson of the NMPD in which Smith identifies the assailant as a young black man, but claims that he did not see the assailant's face. Exhibit three is a July 5, 1980 report by Detective William Flowers of the NMPD in which Detective Flowers wrote that the "Victim [Smith] advised that he could not describe suspect at this time but is willing to be reinterviewed at a later date." Exhibit four is a July 5, 1980 report by Officer John Patton of the NMPD indicating that Smith did not get a good look at the suspect.

[6]373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

[7]See United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); State v. Edgin, 902 S.W.2d 387, 389-390 (Tenn. 1995).

The United States Supreme Court established the standard for determining materiality in United States v. Bagley. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." See 473 U.S. at 682. The existence of "reasonable probability" centers around whether the court has confidence in the verdict of the case despite non-disclosure of the exculpatory evidence. See id. at 678. The court must view the suppressed evidence collectively in the context of the entire record to determine whether the evidence is material under Bagley.[8]

In this case, we find that although the evidence in exhibits one through seven is exculpatory and favorable to the appellant, the evidence when viewed collectively is not material.

The essence of the State's case against the appellant was the testimony of three eyewitnesses and the appellant's friend, Victor Davis.[9] The jury heard the testimony of Robert Bell, who was the owner of the market where the robbery and murders took place. In his testimony, he described in detail how the assailant entered the store and held him, his son, and Louis Smith at gun point before robbing and shooting them. According to Bell, the assailant held them captive behind the check-out counter while a few customers entered and left the store. The assailant told Bell that he had nothing to lose and ordered Bell's son, Bobbie, Jr., to give him the money from the cash register. After filling a paper bag with money, the assailant robbed Bell and Louis Smith before shooting each of them and Bobbie, Jr. with a .38 caliber pistol.[10]

---

[8]See Kyles v. Whitley, 514 U.S. ___, ___, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490, 505-08 (1995); United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976). The Tennessee Supreme Court followed Bagley and Kyles in State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995).

[9]The trial record containing the transcripts of witness testimony was not made a part of the record in this appeal. However, due to the procedural history and magnitude of this capital case, we will take judicial notice of the trial record.

[10]Bullet fragments recovered from the victims were identified by Patrick Garland, a senior firearms examiner of the Tennessee Bureau of Investigation. Garland testified that the fragments were consistent as having been fired from a .38 caliber revolver.

7

At trial, Bell identified the appellant as the perpetrator of the crimes. He emphasized that although he did not originally know the appellant's name, he clearly recognized him as a customer who had frequented the market in the months preceding the robbery.[11] Bell specifically remembered that the appellant had been in the market three nights before the robbery and had helped another customer, Michael Lawrence, purchase beer.[12]

After the robbery, Bell identified the appellant, on four separate occasions, as the perpetrator. First, when emergency crews began arriving at the crime scene, Bell pointed Michael Lawrence out of a crowd of bystanders as the man who had been in the store with the appellant three nights before the robbery. Bell testified he knew at that time that the appellant was the same man who had just robbed his store. Additionally, Bell positively identified the appellant as the assailant from a photographic line up, a physical line up, and in his testimony at trial. According to Bell, the appellant fit his description of the perpetrator being roughly 5' 10" and between 160 and 170 pounds. Bell stated that on the night of the robbery, the appellant was wearing a dark shirt, dark pants, and a dark checkered sport coat.

Bell's pre-trial description of the assailant was generally consistent with the description he provided at trial. However, in his July 6, 1980 statement given to Detective Jerry Moore, Bell indicated that the assailant had no facial hair. The appellant's mug shot taken one day after the robbery revealed that the appellant had a faint mustache and a goatee. Although the appellant never received a copy of Bell's statement to Detective Moore prior to trial, his defense counsel questioned Bell on the

_____

[11]Bell testified that he had seen the appellant in the store on numerous occasions. About four months before the robbery, the appellant stopped by the market and told Bell that he had just returned from Ohio. During a later visit, he told Bell that he had gotten a job with the nearby Vanderbilt Hospital. Bell testified that the appellant shopped in the store about three to four times a week and often wore his hospital work clothes.

[12]Bell testified that on July 2, 1980, the appellant had been shopping in the store and was about to leave when he let another man borrow some change to purchase beer. After the robbery, Bell recognized the other man, Michael Lawrence, standing amongst a crowd of onlookers in the market parking lot. Lawrence testified at trial that he had been in the store on July 2 when the appellant gave him some change for a beer.

8

issue of facial hair. Bell explained that he focused on the assailant's eyes during the robbery and did not notice anything distinctive about facial hair.

Another eyewitness, Louis Smith, testified for the State that he was in the store when the robbery and murders occurred.[13] His testimony corroborated the testimony of Robert Bell and he provided details concerning the time sequence of the robbery. According to Smith, the assailant spent almost fifteen minutes in the market during which time he held Bell, Bobbie, Jr., and Smith at gun point behind the counter. Smith remembered a few customers entering and leaving the store during the robbery; however, he stated that he did not notice them closely because he was focused on the assailant.[14] Smith further remembered Bobbie, Jr. crying as the assailant ordered him to take money from the cash register and place it into a paper bag. According to Smith, the assailant took the money and then began firing his gun. Smith testified that he dove on top of Bobbie, Jr. after he saw the assailant shoot him with the gun.

At trial, Smith identified the appellant as the perpetrator of the robbery and murders. He testified that the assailant was a black male about 5' 8" and 160 pounds. However, before trial, it is apparent that Smith could not positively identify the assailant. In interviews conducted by Officer Patton and Officer Dobson, Smith indicated that he did not get a good look at the suspect. Moreover, in a report by Detective Flowers, Smith advised that "he could not describe the suspect at this time but is willing to be reinterviewed at a later date." Smith testified at trial that he gave statements to police officers after the robbery; however, the prosecution never

---

[13]During the appellant's trial, Louis Smith was under indictment on an unrelated charge of aggravated rape. See State v. Louis Edgar Smith, No. C6175-A. The appellant claims that a defense pleading in the Smith case was Brady evidence that the State should have disclosed in his case. We find that any pleading in the Smith case was public record and not in the exclusive control of the State. Thus, the State's failure to disclose the pleading to the appellant was not a Brady violation.

[14]The appellant's trial counsel cross-examined Smith on his ability to identify the various customers who entered the store during the robbery. Smith testified in accordance with his pre-trial statement to Detective William Robeck that he remembered a few customers entering and leaving the store during the robbery. However, he admitted that he could not accurately identify the customers except for the last customer, Charles House. Smith's statement to Robeck was never disclosed to the appellant at trial. However, we find that the jury heard the substance of Smith's statement when he was cross-examined by defense counsel.

disclosed those reports to the appellant.[15]

On July 6, 1980, one day after the robbery, Detective William Robeck presented a photographic line up to Smith. Robeck's report indicates that Smith picked photographs five and six as matching the assailant, with photograph number four being a picture of the appellant.[16] At trial, Smith testified that he picked two photographs that closely fit his description of the assailant; however, the prosecution never disclosed Detective Robeck's report to the appellant.

Additionally, before trial, Smith was asked to identify the perpetrator from a physical line up. Smith testified that he believed person number two, the appellant, to be the assailant. However, he stated that he could not make a positive identification because the appellant had his hair "up in curls" at the line up, unlike his hair style at the crime scene.

The State's third eyewitness was Debra Smith, a customer who entered the store during the robbery. Ms. Smith testified that she went to Bell's market on July 5, 1980 between 9:30 p.m. and 9:50 p.m. to pick up a cold beverage. When she arrived at the market, she noticed a man standing in a phone booth and a cab parked out front with the driver waiting in the front seat. Upon entering the store, she observed Robert Bell, Bobbie, Jr., Louis Smith, and the appellant standing behind the counter. She testified that she knew the appellant from having seen him on prior occasions in another convenient store. She further stated that she had visited in the appellant's home in the past and had gone to high school with the appellant's older brother.

According to Ms. Smith's testimony, she knew that a robbery was in progress when she payed for her beverage at the check-out counter. She stated that although

---

[15]After Smith's direct examination, the State supplied defense counsel with a seventeen page transcript of a tape-recorded statement given by Smith on July 11, 1980. The recording contains statements by Smith concerning the events of the robbery and descriptions of the assailant. However, the recording contains no information regarding other statements that Smith gave to the police.

[16]At a pre-trial suppression hearing in 1981, Smith testified that he picked photographs four and six as matching the assailant. The appellant did not cross-examine Smith at trial regarding this discrepancy.

she did not see the appellant's gun, she noticed Bobbie, Jr. crying as he handed her the change from her purchase. She further testified that she immediately left the store and returned to her boyfriend's house without calling the police. Besides telling her sister about the robbery, she did not communicate her knowledge of the incident until police contacted her on July 15, 1980. She explained at trial that she kept quiet because she knew the appellant and she did not want to get involved.

During cross-examination, Ms. Smith expressed difficulty in identifying Louis Smith as the fourth man in the market. She admitted that she originally thought that Smith was the appellant's accomplice in the robbery. She stated that she remembered seeing Smith behind the counter with the appellant; however, she identified Smith as a black male. The appellant's counsel reminded her of her earlier testimony during direct examination in which she stated that Smith was Caucasian.

One of the State's key witnesses at trial was Victor Davis, a close friend of the appellant. Davis was originally listed as an alibi witness for the defense. However, at trial, Davis testified for the prosecution concerning his activities with the appellant leading up to the events at Bell's Market. Davis testified that he and the appellant had gone to Franklin, Tennessee during the afternoon on July 5, 1980. While in Franklin, the two men picked up chicken at a local KFC and spent time gambling at a hangout near the Franklin high school. Davis testified that they went back to the KFC around 9:00 p.m. that evening, but the restaurant was already closed. While sitting in the KFC parking lot, the appellant told Davis that he would have robbed the restaurant if it had been open. Davis stated that he noticed the appellant carrying a dark .38 caliber pistol during their time in Franklin. He also remembered that the appellant was wearing a black shirt and denim jeans.

Davis testified that he was having car trouble on July 5, but that he and the appellant returned to Nashville before 10:00 p.m. Davis estimated that the return trip from Franklin took them about forty-five minutes. When the two arrived in Nashville, Davis dropped the appellant off a few blocks from Bell's Market. Davis testified that

11

as the appellant was exiting the car, he told Davis that "he was going to rob Bob Bell" and "was going to try not to leave no witnesses."

Davis testified that he did not see the appellant again until about five minutes after the appellant left his car. Davis explained that he observed the appellant walking in the direction of his home with a paper bag in one hand and a pistol in the other. Davis stopped his car and picked up the pistol which the appellant had thrown on the ground. The two men then proceeded to the appellant's father's house, arriving shortly after 10:00 p.m.[17] Davis testified that, during their visit, the appellant counted about two hundred ($200) dollars from the paper bag and gave forty dollars ($40) of the money to Davis. While handling the money, the appellant told his father that he had been gambling in Franklin, Tennessee. The appellant then called his girlfriend on the telephone before leaving with Davis to pick up some beer. Davis testified that the appellant made only one comment that evening concerning his involvement in the robbery. As Davis and the appellant were leaving his father's home, the appellant told Davis that "he didn't mean to shoot that boy."

During cross-examination, the appellant's counsel attempted to impeach Davis' testimony by emphasizing that Davis was originally a witness for the defense.[18] Davis admitted that he had never disclosed the incriminating facts against the appellant until after his arrest on the Saturday before trial.[19] He explained that he initially withheld the information because he did not want to get involved in the case against the appellant.[20] He also expressed fear that he would be considered an accomplice to the

---

[17]Davis was certain of this time frame because he remembered seeing the ten o'clock news program on T.V. at the appellant's father's house.

[18]In pre-trial statements given to police investigators and the public defender's office, Davis originally explained that he and the appellant had driven from Franklin, Tennessee straight to the appellant's father's house in Nashville. The defense planned to use Davis to establish an alibi for the appellant.

[19]On the Saturday before the appellant's trial, Davis was arrested by police for public drunkenness and as a suspect in an unrelated robbery. Information concerning the outcome of that arrest was not made a part of the record in this appeal.

[20]According to Davis, he and the appellant had agreed before trial to keep their stories consistent regarding the events on July 5, 1980.

12

crimes at Bell's Market. Thus, he testified that he did not come forward with complete information about the case until the State promised him immunity for his testimony.

The appellant argues that he could have impeached both Robert Bell and Louis Smith if the prosecution had properly disclosed the exculpatory evidence contained in exhibits one through seven.[21] We agree that the suppressed evidence would have strengthened the appellant's ability to cross-examine those two eyewitnesses. However, after considering that evidence collectively with the record, we have complete confidence in the verdict.

The record reflects that three eyewitnesses separately identified the appellant as the perpetrator of the crimes. Specifically, Robert Bell and Debra Smith both recognized the appellant from past experiences and knew without a doubt that he was the assailant in Bell's Market. Although Bell's and Louis Smith's pre-trial descriptions of the assailant were flawed, their testimony at trial was strengthened by Victor Davis, who placed the appellant at Bell's Market during the time of the robbery. We find that the appellant had full opportunity to impeach the testimony of Davis without disclosure of the Brady evidence. However, Davis' testimony concerning the events before and after the robbery was uncontroverted.

In light of Davis' testimony and the testimony of the corroborating eyewitnesses, we have confidence in the verdict even though the prosecution withheld exculpatory evidence. We, therefore, find no reasonable probability that the results of the case would have been different if the State had disclosed that evidence to the appellant.

## II.

The appellant next contends that the trial court erred in failing to set aside his

---

[21]The appellant also argues that he could have impeached the testimony of Debra Smith if the State had properly disclosed the July 6, 1980 report by Detective Robeck. In that report, Louis Smith provided vague descriptions of the customers who entered Bell's Market during the robbery. The appellant contends that he could have used Smith's statements to challenge Ms. Smith's testimony concerning her presence in the market on that evening. The record, however, reflects that Smith never testified that Ms. Smith was a customer in the market during the robbery. Moreover, Smith admitted at trial that he could not clearly identify any customer except Charles House. Thus, we find that Smith's statements to Detective Robeck would have provided the appellant with little assistance in the cross-examination of Debra Smith.

convictions because the jury instructions at trial did not properly define the "reasonable doubt" standard. He specifically argues that the phrases "moral certainty" and "let the mind rest easily" in the instructions allowed the jury to convict him on a lower standard of proof in violation of the decisions in Cage v. Louisiana[22] and Victor v. Nebraska.[23] This issue is without merit.

In this case, the trial judge instructed the jury on reasonable doubt as follows:

Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a captious, possible, or imaginary doubt. Absolute certainty of guilty is not demanded by the law to convict of any criminal charge, but moral certainty is required as to every proposition of proof requisite to constitute the offense.

The appellant concedes that this Court has previously upheld the constitutionality of similar jury instructions.[24] However, he requests this Court to re-examine the "reasonable doubt" issue in light of Rickman v. Dutton.[25]

We initially find that the appellant's claim is time-barred by the three year statute of limitations in Tennessee Code Annotated section 40-30-102 (repealed 1995).[26] The appellant first raised the "reasonable doubt" issue in his second post-conviction petition filed in February 1995, under the pre-1995 Post Conviction Procedure Act. Accordingly, almost five years elapsed between the United States Supreme Court's ruling in Cage and the appellant's second post-conviction petition.

We find that since the Supreme Court's decision in Cage, there has been no

---

[22] 498 U.S. 39, 41, 111 S.Ct. 328, 329-30, 112 L.Ed. 2d 339 (1990).

[23] 511 U.S. 1, __, 114 S.Ct. 1239, 1247-48, 127 L.Ed. 2d 583 (1994).

[24] See e.g. PettyJohn v. State, 885 S.W.2d 364 (Tenn. Crim. App. 1994), per app. denied (Tenn. 1994).

[25] 864 F.Supp. 686 (M.D. Tenn. 1994), appeal docketed, No. 94-6232 (6th Cir. Oct. 3, 1994).

[26] In its brief, the State argues that the appellant has waived any challenge to the definition of "reasonable doubt" in the jury instructions by failing to raise the issue at trial, on direct appeal, or in his first post-conviction petition. We find, however, that the appellant's first opportunity to raise this particular issue was not until the United States Supreme Court decided Cage on November 13, 1990. Therefore, we find no waiver on this issue. However, although not raised by either party on appeal, we find it appropriate to determine whether the issue is time barred by the three-year statute of limitations in Tennessee Code Annotated section 40-30-102 (repealed 1995).

subsequent constitutional rule on "reasonable doubt" jury instructions to warrant an exception to the three-year statute of limitations.  See Burford v. State, 845 S.W.2d 204, 208-210 (Tenn. 1992).  The appellant's reliance on Victor v. Nebraska and Rickman v. Dutton does not affect our decision.

In Victor, the United States Supreme Court readdressed the use of the "moral certainty" phrase in jury instructions.  The Court reasoned that the phrase "moral certainty" may have lost its historical meaning and that modern juries might interpret "moral certainty" to mean something less than the high level of determination constitutionally required in criminal cases.  However, the Court in Victor did not espouse a new constitutional rule concerning the use of "moral certainty"  in jury instructions.  Instead, the Court merely expressed criticism regarding the continued use of the "moral certainty" phrase.

The appellant also relies on Rickman v. Dutton, a decision from the United States District Court for the Middle District of Tennessee.  In Rickman, the district court held that a jury instruction containing the phrases "moral certainty" and "mind rest easily" suggested to a reasonable juror a lower burden of proof than is required by constitution.  See 864 F.Supp. at 709.  Although we acknowledge that the district court's ruling in Rickman pertained to a jury instruction similar to the one in the appellant's case, we are not bound by decisions of the district court.[27]

Moreover, this Court and the Tennessee Supreme court have specifically addressed and upheld the constitutionality of jury instructions similar to the one in this case.[28]  We, therefore, conclude that, even if the appellant's claim were not time barred, his contention is without merit.  The reasonable doubt instruction given at the

---

[27]See State v. Jones, 598 S.W.2d 209 (Tenn. 1980); Maurice Booker v. State, No. 01C01-9606-CC-00271 (Tenn. Crim. App. at Nashville, June 30, 1997).

[28]See State v. Nichols, 877 S.W.2d 722 (Tenn. 1994); PettyJohn v. State, 885 S.W.2d 364, 365-66 (Tenn. Crim. App. 1994), per app. denied (Tenn. 1994); Maurice Booker v. State, No. 01C01-9606-CC-00271 (Tenn. Crim. App. at Nashville, June 30, 1997).  Additionally, the United States Sixth Circuit Court of Appeals has recently upheld the constitutionality of reasonable doubt instructions containing the phrases "moral certainty" and "mind rest easily."  See Austin v. Bell, No. 86-00293 (6th Cir. October 2, 1997).

appellant's trial properly reflected the standard of proof required by the state and federal constitutions.

### III.

The appellant next contends that the trial court erred in failing to set aside his two convictions of first degree murder because the jury instructions at trial improperly merged the "premeditation" and "deliberation" elements of first degree murder. He argues that the merger of those elements in the jury charge violated his constitutional rights as set forth in State v. Brown, 836 S.W.2d 530 (Tenn. 1992).

This issue is without merit.

The jury instruction on the elements of first degree murder included the following in pertinent part:

> (4) that the killing was premeditated. This means that the intent to kill must have been formed previous to the act itself. Such intent to design to kill may be conceived and deliberately formed in an instant. It is not necessary that the purpose of kill[ing] pre-exist in the mind of the accused for any definite period of time. It is sufficient that it preceded the act, however, short the interval.

The appellant contends that the rule in State v. Brown should apply retroactively to the jury instruction given at his trial in 1982.

In Brown, the Tennessee Supreme Court held that courts should abandon the use of jury instructions which dictate that "premeditation can be formed in an instant." See id. at 543. The Court reasoned that such an instruction on premeditation might cause juror confusion since the jury must also be instructed on deliberation. As the Court acknowledged, the element of deliberation cannot be formed in an instant, but requires some interval of time.

We agree with the appellant that if applied retroactively, the rule from Brown would entitle him to relief on his first-degree murder instruction. However, this Court has previously held that Brown did not create a new constitutional ground for relief in

16

post-conviction proceedings.[29] To the contrary, in previous cases, this Court has ruled that "the mere fact that such an instruction has been abandoned as confusing does not necessarily mean that its previous use equated with a due process violation rendering a first degree murder conviction void."[30] The rule in <u>Brown</u> is to be applied prospectively, not retroactively.

We, therefore, conclude that the appellant is not entitled to relief based upon his first-degree murder instruction.

**IV.**

The appellant next contends that the cumulative effect of the claims in his second post-conviction petition, when viewed collectively with the claims asserted in his first petition, calls for a new trial. This issue is without merit.

In the appellant's first post-conviction petition, he raised thirty two grounds for relief. The trial court, as affirmed by our supreme court, denied relief on all grounds. In his second petition, the appellant raised four new grounds for post-conviction relief. The trial court determined that the issues raised in that petition were without merit; and on appeal, we are affirming the judgment of the trial court. Therefore, we find no cumulative effect or error sufficient to warrant a new trial.

Based on the foregoing, the judgment of the trial court is affirmed. Unless otherwise stayed by a court of competent jurisdiction, the appellant's sentences of death shall be carried out on March 5, 1998.

---

[29]See <u>Phillip Rex Spight v. State</u>, No. 02-C-01-9501-CR-00034 (Tenn. Crim. App., at Jackson, November 15, 1995), *per app. denied* (Tenn. 1996). Relief requested in a post-conviction petition may be granted only when the petitioner's sentence or conviction is void or voidable because it contravenes a state or federal constitutional right. <u>See</u> Tenn. Code Ann. § 40-30-105 (repealed 1995); <u>see</u> <u>also</u> <u>State v. Neal</u>, 810 S.W.2d 131 (Tenn. 1991).

[30]See <u>Phillip Rex Spight v. State</u>, No. 02-C-01-9502-CR-00034, slip op. at 7 (quoting <u>John Wayne Slate v. State</u>, No. 03-C-01-CR-00014 (Tenn. Crim. App., at Knoxville, April 27, 1994), *per. app. denied*, concurring in results only (Tenn. 1994)); <u>State v. Willie Bacon, Jr.</u>, No. 1164, (Tenn. Crim. App., at Knoxville, Aug. 4, 1992); *per. app. denied* (Tenn. 1992).

_____
WILLIAM M. BARKER, JUDGE


CONCUR:


_____
JOHN H. PEAY, JUDGE


_____
JERRY L. SMITH, JUDGE